The PEOPLE of the State of Colorado,
Plaintiff–Appellee,

v.

Ronald Lee WHITE, Defendant–
Appellant.

No. 91SA248.

Supreme Court of Colorado,
En Banc.

Jan. 10, 1994.

Rehearing Denied Feb. 28, 1994.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., John Daniel Dailey, Deputy Atty. Gen., Robert Mark Russel, First Asst. Atty. Gen., Robert M. Petrusak, Asst. Atty. Gen., Criminal Enforcement Section, Denver, for plaintiff-appellee.

David F. Vela, Colorado State Public Defender, Michael J. Heher, Deputy State Public Defender, Denver, for defendant-appellant.

Justice VOLLACK delivered the Opinion of the Court.

Appellant Ronald Lee White (White) automatically appeals the district court's sentence of death entered in *People v. White*, No. 90CR97 (May 16, 1991).[1] The district court entered a judgment of conviction upon

---

1. Our jurisdiction over this direct appeal is established by § 16–11–103(7)(a), 8A C.R.S. (1986), which provides that "[w]henever a sentence of death is imposed upon a person pursuant to the provisions of this section, the supreme court shall review the propriety of that sentence," and by C.A.R. 4(e).

White's plea of guilty to the charge of first-degree murder after deliberation of Paul Vosika (Vosika). After holding both a providency hearing on the guilty plea and a sentencing hearing, the district court entered a sentence of death pursuant to section 16–11–103, 8A C.R.S. (1986). We affirm the district court's imposition of a sentence of death.

## I.

## THE FACTUAL BACKGROUND

The district court imposed a sentence of death in the Vosika case based in part on guilty pleas which White entered in two first-degree homicide cases, involving the deaths of Victor Lee Woods and Raymond Garcia. Since some of the issues raised in the direct appeal involve the factual background underlying all three homicides, the facts of each are presented below.

### A. THREE HOMICIDES

#### Victor Lee Woods

On January 25, 1988, White met Victor Lee Woods (Woods) outside of a bar in Colorado Springs when Woods asked White for a ride home.[2] Upon arrival at Woods' home, White stated that Woods invited him inside for a beer. White entered Woods' apartment and read magazines while Woods went to another part of the apartment. Woods returned a few minutes later and made a sexual advance towards White while threatening White with a knife. White took the knife away from Woods and proceeded to beat Woods who subsequently left the room. Woods returned and attacked White, and the two proceeded to have a second fight, during which White repeatedly stabbed Woods. White eventually left Woods in the bedroom and set fires in the bedroom in the immediate area of Woods' body, in the closet, and in the living room.

On April 12, 1988, White entered a plea of guilty to a charge of first-degree murder with respect to Woods' homicide. White received a sentence of life.

2. The Judgment of Conviction (sentence and mittimus) states that the offense occurred on or

#### Raymond Garcia

White entered the night clerk's office at the Hampton Inn in Pueblo. While attempting to rob the Inn, White shot both Raymond Garcia (Garcia) in the back of his head, and Robert Martinez in his jaw. Garcia died as a result of the gunshot.

On April 8, 1988, White entered a plea of guilty to the charges of first-degree murder, attempted first-degree murder, and aggravated robbery. White received a sentence of life with respect to the first-degree murder charge.

#### Paul Vosika

On March 26, 1988, Corporal Roger Gomez (Officer Gomez) received a telephone call from a farmer who stated that he had discovered a decomposed animal or human body near the Cedarwood Lane and Abbey Road area in Colorado City in Pueblo County. Officer Gomez proceeded to the location described by the farmer and subsequently discovered a decomposed human torso. Officer Gomez noted that the torso did not have either a head or hands attached to it.

On May 7, 1988, Officer Gomez responded to a telephone call wherein Officer Gomez learned that a skull had been discovered in Rye Mountain Park, in Pueblo County. Officer Gomez went to the location and found the skull in a ravine. Officer Gomez also located some plastic bags, remnants of some black plastic, and a quarter-inch, knotted, white cord in an area where he found what appeared to be a shallow grave. In the same area, Officer Gomez found a pair of black leather gloves, and a miter saw that was partially covered by some pine needles.

On May 9, 1988, Dr. Glen Ferguson, Vosika's stepfather, filed a missing person report, informing Officer Gomez that Vosika had been missing for approximately eight or nine months, since late August or early September, 1987. Dr. Ferguson supplied Officer Gomez with a photograph of Vosika.

about January 26, 1988.

James Kramer (Kramer), the Pueblo County Coroner, was present with Officer Gomez when he located both the torso and the skull. After receiving the reports of a forensic pathologist and of a forensic anthropologist, Kramer determined that the torso belonged to Vosika. In May 1988, through both dental identification and cross-referencing dental records, Kramer determined that the skull belonged to Vosika. Kramer ascertained that a single gunshot wound to the head was the cause of Vosika's death. Kramer determined that a gunshot entered the back of Vosika's head and exited in the cheekbone region.

On May 12, 1989, while incarcerated at Centennial Correctional Facility, White entered a plea of guilty to a charge of second-degree assault on another inmate, committed on December 12, 1988.

## B. STATEMENTS MADE BY WHITE

### White's Statements to Officer Perko

On November 30, 1989, and on December 8, 1989, White gave statements to Correctional Officer Frank Perko (Officer Perko). Officer Perko prepared a report based on the statements and forwarded the report to the District Attorney's office. White told Officer Perko that he and Vosika were good friends, and had both consumed and sold narcotics together. White stated that their relationship had deteriorated because Vosika owed White a sum of money that he could not pay. White additionally suspected Vosika of stealing his wallet, which had contained $1,500. White confronted Vosika and informed him that if he did not pay White the money he owed White, then White would kill him. Vosika explained that he would rob a place in order to repay White. They agreed to go to Cheyenne, Wyoming, to execute the robbery.

When they arrived at a truck stop in Cheyenne, Vosika refused to execute the plan. White drove to a secluded area, made Vosika get out of the car and kneel, while begging for his life. White stated that he placed a book against Vosika's head and shot him. He subsequently returned to Colorado.

White informed Officer Perko that he buried the body but subsequently unearthed it

and severed the head and hands. White stated that he disposed of the parts in different locations, and later gave Officer Perko a map showing where he buried the body parts and the saw. White also indicated to Officer Perko that he wanted to be transferred to Wyoming.

### White's Statements to Officer Gomez

In December of 1989, Officer Gomez and Detective McCain went to Centennial to interview White. At that time, investigation of the Vosika murder had been on inactive status. On December 22, 1989, Officer Gomez had a conversation with White, wherein White informed Officer Gomez that Vosika was heavily involved in drugs and stole things from his friends and family in order to maintain his habit. White stated that Vosika stole two ounces of cocaine and approximately $1,500 from White's wallet. White informed Officer Gomez that he had planned on killing Vosika as a result of the thefts. White stated that he planned a robbery of a truck stop in Cheyenne, Wyoming. White intended to take Vosika to the truck stop and direct Vosika to complete the robbery, after which Vosika could repay White the money stolen. White informed Officer Gomez that he planned Vosika's last meal when purchasing a case of beer.

White told Officer Gomez that he proceeded to Wyoming with Vosika, but when the two arrived in Cheyenne, Vosika began to "chicken out" when he saw a security guard. As a consequence, White forced Vosika to go to the rear of the vehicle and kneel on the ground. Vosika, according to White, was crying, so White called him a "bitch" and directed him to "stop crying and die like a man." For the following half hour, Vosika cried and begged for his life. White eventually retrieved a paperback novel from the rear of his vehicle, placed it behind Vosika's head, and shot him through the back of the head. White stated that he used the book to "cause less blood."

White picked Vosika up and threw him in the trunk, covering him with a beige curtain. White returned to Pueblo and retired for the evening. The next day, he watched a television program before driving the body to Col-

orado City. He found a bushy area near the side of the road. He removed Vosika's body from the trunk and pushed or kicked it through a barbed wire fence. At some point, a man, woman and small child approached in a red truck. White moved the curtain in order to hide the body, but stated that he had a gun accessible in the waistband of his pants and would have shot the people if necessary. The truck eventually drove off. White became upset as a result of the truck's passing, so he struck Vosika's head twice with a shovel. White placed the body approximately thirty feet from the south side of the road and returned to Pueblo.

While in Pueblo, White became concerned that the people in the red truck saw him place the body away from the road. White then decided to return and dismember the body in order to prevent identification of it by destroying evidence of fingerprints and dental charts. White procured a miter saw, a shovel, some plastic bags, and some cord. He returned to the body later that night. White first removed Vosika's hand by placing his foot on Vosika's forearm and holding his hand. White stated that it felt strange to hold Vosika's hand because it felt as if he were holding his own hand. White stated that he was surprised at how easily the hand was removed.

White told Officer Gomez that he wrapped Vosika's head in a plastic bag and secured the bag with a cord. White propped the head up and started cutting with a miter saw. White stated that this was more difficult than he anticipated because the saw blade got stuck on vertebrae in the neck. He was surprised at the amount of blood in the bag, so he removed the head from the first bag and placed it in a second bag. During the conversation, Officer Gomez asked White if he owned a pair of gloves similar to the pair found in Rye Mountain Park. White first responded in the negative, but later stated that he did in fact own a similar pair of gloves. White informed Officer Gomez that he used plastic trash bags to transport Vosi-

ka's body, and that he used the saw to remove Vosika's head and hands. White informed Officer Gomez that he took the remains up to the mountains so animals could discover them and drag them away, and that he dug a shallow grave for the remains.

### White's Statements to Officer Spinuzzi

On February 23, 1990, White gave a different account of events to Sergeant Tony Spinuzzi (Officer Spinuzzi).[3] White informed Officer Spinuzzi that Vosika had stolen his narcotics and money, and had forced him to flush narcotics in the toilet. White also stated that he and Vosika were in the kitchen at 119 Bonnymede in Pueblo when Vosika told White that he had "charged some dope" to White's name. White pulled a gun out of a drawer and forced Vosika to get on the kitchen floor. White was going to kill Vosika in the kitchen, but changed his mind and directed Vosika to crawl from the kitchen to the garage. Once inside the garage, White told Vosika that he would open the garage door and give Vosika a chance to run. White stated that he did this so Vosika would not get up and attempt to run. White approached Vosika who was lying on the garage floor, placed a couple of books on Vosika's head, and shot Vosika. White subsequently put a bag over Vosika's head, lined the trunk of his car with a shower curtain, wrapped Vosika's body in a mattress cover and put Vosika's body in the trunk of the car.

White informed Officer Spinuzzi that, on the following day, he purchased a shovel and drove to the Cedarwood Lane area where White drove off the road and stopped his car. White unloaded Vosika's body and placed it behind some bushes. White saw a truck approach and stop, so he left the area and returned to Pueblo. Later that day, White went to a hardware store and purchased a saw. He returned to the Cedarwood area and used the saw to remove the head and hands from Vosika's body. White informed Officer Spinuzzi that he did so in order to

---

3. On January 26, 1990, White gave a statement to Undersheriff Avery (Officer Avery), informing Officer Avery that the homicide occurred in Pueblo. White subsequently wrote several letters to various officers wherein White alleged, among other things, that either Vosika's sister, Colombian gangsters, President Reagan, or a three-year-old gang member were responsible for the homicide.

prevent recognition of the body. White subsequently placed the head and hands in a bag, tied the bag, and buried the bag with the saw in the park. White stated that he wore tight-fitting black gloves at this time, and that he threw his clothing away in different trash cans.

During their conversation, White told Officer Spinuzzi that he had killed two people in Adams County, in Colorado Springs, and at the Hampton Inn. Subsequent to their conversation, White wrote several letters to Officer Spinuzzi, in which he stated that most of the information that he had provided to Officer Spinuzzi consisted of lies. In one letter, White wrote, "I told you Bill did it before he even told on me.... But I will still say I did it."[4]

## C. *PRELIMINARY PROCEEDINGS*

Based on his confessions, a direct information charging White with first-degree murder during "the last week of August, 1987 and [on] the 15th day of September, A.D.1987," was filed on March 9, 1990. The district court held a hearing on April 17, 1990, wherein counsel for White questioned White's competency based on the "wildly contradictory" confessions given by White. Counsel for White requested that a competency examination be performed prior to a preliminary hearing. Counsel for White additionally requested that White be present at all proceedings in the case. White was present at that hearing. The district court, on April 19, entered an order directing the Colorado State Hospital to perform a competency evaluation of White pursuant to section 16–8–106, 8A C.R.S. (1986), at Centennial. On June 5, 1990, the district court entered an order finding White competent to proceed based on a report written by a state hospital staff psychiatrist, Dr. Seymour Sundell.

On June 15, White filed a motion requesting the district court to issue an order authorizing a second psychiatric evaluation of White to be conducted by a psychiatrist of White's own selection pursuant to section 16–8–108, 8A C.R.S. (1986). The People opposed this motion on the grounds that White did not have an absolute right to an appointment of a psychiatrist of his own choosing. The People also contended that White did not demonstrate "good cause" for the need of a second opinion.

The district court subsequently entered an order setting the People's motion in opposition for hearing on Monday, July 2. On July 23, the district court entered an order wherein it found that good cause was not a prerequisite to ordering a psychiatric evaluation pursuant to section 16–8–108. The district court ordered that Dr. William Ingram be given a reasonable opportunity to conduct a psychiatric examination of White, and that the expense of the examination be paid by the State of Colorado.

On August 16, White filed a request to enter a plea of guilty to the charge of first-degree murder on the condition that he be sentenced to death rather than life imprisonment. White contended that he would "rather receive the death penalty and be executed than to continue having to contend with the corruption, hypocrisy, hostility and cruelty" he confronted at Centennial Correctional Facility. On September 20, the district court held a hearing and concluded that it could not accept White's plea because it could not accept a predetermined sentence of death.

A preliminary hearing was held on October 15, 1990. The People called as witnesses Officer Gomez, Officer Perko, and Officer Spinuzzi. Each officer testified regarding the statements given to them by White. White contended, among other things, that venue was not proper in Colorado since the crime occurred in Wyoming. The district court entered an order on October 29, 1990, finding probable cause existed to proceed with prosecution of the charge contained in the information based on evidence adduced at the preliminary hearing.

On November 14, White filed a motion for payment of a psychiatrist, on the ground that White was an indigent and could not afford to retain a psychiatrist prior to any determi-

---

4. White was referring to William Young, a former associate, whom he had attempted to implicate in the homicide.

nation by counsel regarding whether pleas of not guilty by reason of insanity or not guilty by reason of impaired mental condition existed.

On January 15, 1991, White requested that one of three psychiatrists, including Dr. William Ingram (Dr. Ingram) and Dr. Kathy Morall (Dr. Morall), be "appointed to assist him in connection with any death penalty hearing which may be held." On February 12, 1991, the district court entered a second order appointing Dr. Ingram to examine White pursuant to section 16–8–108. The order referenced a stipulation submitted to the district court by the People on January 8, wherein the People agreed that the findings and conclusions of such a psychiatrist would be confidential and disclosed only to White's counsel. The order also provided that

> Dr. Ingram shall prepare a written report of his examination which addresses the issues of insanity, impaired mental condition, and competency, but that report shall not be filed with this Court. Said report shall be furnished to the Defendant's attorneys of record and shall be a confidential communication between Dr. Ingram and said attorneys. . . .

On the same date, the district court entered an order appointing Dr. Morall to conduct an evaluation of White and submit to the district court a report stating whether White was competent to proceed to a providency hearing.

On February 26, White filed a motion seeking approval of an hourly fee of $80.00 for Dr. Ingram. On March 19, the district court entered an order recognizing that White planned on entering a plea of guilty to the charge of first-degree murder and preferred imposition of the penalty of death. Thus, the district ruled:

> Under the unusual circumstances of this particular case, this Court believes that it is appropriate and proper to deviate from Supreme Court Directive 87–01 concerning Court compensation of experts, and to authorize payment of the defense psychiatrist at 100% of his hourly rate.

On March 22, the district court entered an order setting a providency hearing for White's plea on April 23, to be followed by a sentencing hearing should the district court accept White's plea.

On April 16, the district court entered an order staying the previous district court order directing Dr. Morall to conduct a competency examination. The district court based its order on the grounds that White opposed a continuance and waived any further competency examination, and the district court had previously found that White was competent on June 5, 1990 (based on Dr. Sundell's report). On April 17, 1991, White filed a withdrawal of his request for a competency hearing on the grounds that "he does not intend to pursue his claim that he is mentally incompetent to proceed. [White] admits that he is not able to sustain the burden of proof of showing that he is incompetent."

## D. HEARINGS

### Providency Hearing

At the providency hearing on April 24, 1991, White informed the district court that he was prepared to enter a plea over his attorney's objections. The district court asked White if he had discussed all possible defenses with his attorney, to which White replied that he had. White's attorney stated that he did not have any reason to believe that White was not competent. The district court subsequently established on the record that White understood that he was relinquishing his right to remain silent by entering a plea. The district court also established that White understood that his plea had to be free and voluntary. White testified that he was not under the influence of any drug, alcohol, or medication, and that no one was exercising any influence over him regarding his decision to enter a plea.

The district court established that White understood the charge of murder after deliberation, and, by entering a guilty plea, that he was relinquishing certain constitutional rights. White also indicated that he understood the maximum and minimum penalties corresponding to the charge. The prosecution subsequently called Officer Gomez as a witness, in order to establish a factual basis for the plea. The prosecution also offered testimony given at the preliminary hearing

as part of the factual basis for the plea. The district court then asked White whether he still wished to enter a plea of guilty, to which White responded affirmatively. The district court entered a finding of guilty to the charge, and then took a recess before commencing the sentencing phase of the bifurcated proceeding.

### Sentencing Hearing

The district court reconvened in the afternoon on April 24, and commenced the sentencing hearing. Officer Spinuzzi testified that a .38 caliber revolver was used to kill Vosika, but that a .38 caliber revolver had not been recovered. He also testified that a .38 caliber revolver had been used to kill the clerk in the Hampton Inn case, a crime to which White pleaded guilty. The slugs retrieved in both cases, however, did not appear to have been fired from the same weapon. Officer Spinuzzi testified that White purported to have disposed of the weapons in the Arkansas River, near Baxter Road. The Sheriff's Department, however, did not discover any weapons there. Officer Spinuzzi testified that neither a shower curtain nor a mattress cover was recovered. According to Officer Spinuzzi, no sheriffs either went to Wyoming or contacted law enforcement officers in Wyoming to investigate White's claims that the murder occurred in Wyoming. Officers only investigated the garage at 119 Bonnymede to confirm that a homicide occurred there. The investigation did not yield a copy of the book used in the murder. Officer Spinuzzi characterized White's demeanor during the interview as sober at times, but smirking or grinning at other times. Officer Spinuzzi corroborated the fact that White purchased two .38 caliber revolvers and a shotgun in Denver, in accord with White's statements. White's drawing of the saw matched the saw later discovered.

Officer Avery testified that White did not express remorse, but maintained a solemn facial expression and cooperated in answering the questions. He also testified that the letters he received from White after the confession did not include expressions of remorse with respect to the homicide. Officer Avery testified that he did not believe that the homicide occurred in Wyoming, and that he felt as though White was attempting to manipulate him during the interview and through the letters. Officer Avery testified that he could not independently verify that the homicide did not occur in Pueblo, nor was there any physical evidence specifically connecting White to the homicide. Officer Avery testified that he approached William Young while Young was incarcerated but Young refused to discuss the Vosika homicide.

Sergeant Kenneth Fiorillo (Officer Fiorillo) testified that he investigated the Woods homicide, and took White's statement in that investigation. Officer Daniel Snell (Officer Snell) testified that he investigated the murder of Raymond Garcia (Garcia), who died as a result of a single gunshot to the back of his head while working at the Hampton Inn. Officer Snell also testified that Robert Martinez (Martinez) was shot during this incident, but did not die. White informed Officer Snell that he shot both Garcia and Martinez. Officer Snell testified that White neither expressed remorse with respect to Garcia nor concern with respect to Martinez.

Assistant District Attorney Kathleen Eberling (Eberling) testified that White was convicted of second-degree assault on May 12, 1989. White informed Eberling that he had killed three people and would do it again. He said that, to increase awareness of his perceived mistreatment at Centennial Correctional Facility and to get the attention of the Department of Corrections, he would continue to attempt to murder others at the facility. Eberling testified that she previously worked at the Pueblo District Attorney's office, where Sheriff Templeton of the Pueblo Sheriff's department contacted Eberling with respect to the Vosika case. Initially, White wanted to implicate Young in the Vosika homicide, but Eberling indicated that White's testimony would not be sufficient to file a murder case without corroborating evidence.

Officer Gomez testified that he knew that White had made several different statements over the course of the investigation regarding the manner in which the Vosika homicide occurred. Officer Gomez additionally stated that White's demeanor throughout the con-

fession was businesslike, and that White did not show remorse. According to Officer Gomez, White told him he struck the face of the corpse twice with a shovel after seeing the red pickup truck.

White informed Officer Gomez that he killed Woods in Colorado Springs. White stated that Woods approached him and asked him for a ride home while White was with a woman in a bar. After arriving home, Woods made a sexual advance to White while holding a knife. Woods grabbed White by his hair, threw White on the ground, and placed his foot on White's back. By acting scared, White was able to take the knife away from Woods. White stabbed Woods in his rib area and beat Woods after toying with him for half an hour.

Officer Gomez testified that White's statement regarding the Woods homicide reflected pleasure and not remorse. He also testified that White confessed to killing two men many years prior to 1988, whose bodies were never discovered. White refused to inform Officer Gomez where the bodies were located. White did inform Officer Gomez that he robbed the Holiday Inn, the Raintree, and the Hampton Inn, where he committed a homicide.

Officer Gomez first approached White with Officer Templeton in reference to Young, before White confessed to Officer Perko. White then indicated that Young was responsible for Vosika's death. Officer Gomez discovered trash bags, a cord, and human hair in the "shallow grave." Officer Gomez inspected the fence through which White allegedly put the body, and did not discover any fabric or flesh on the wire. During their second interview, White told Officer Gomez that Young did not murder Vosika, but rather that White did. Officer Gomez testified that White stated, in a sarcastic voice, that he had been rehabilitated since their first interview. White additionally informed Officer Gomez that he had committed an assault while in prison.

Counsel for White subsequently commenced presentation of mitigating evidence. In his opening statement, counsel for White contended that White entered a plea of guilty not because of the overwhelming evidence of his guilt, but because he wanted to make the point that he would rather die than continue living subject to the treatment he was receiving in the Department of Corrections. Counsel for White indicated that White had served three years of two previous life sentences he had received. Counsel for White also contended that the death penalty was not necessary in White's case, because White does not present a threat to society as White would never be likely to be out of prison for the rest of his life.

Father Gabriel Weber (Father Weber) testified that he had known White for twelve to fourteen years in his capacity as a parish priest. Father Weber testified that he regularly met with White once every two or three months. Father Weber also testified that White "changed so much for the better" as a result of his belief in God.

Steven Kantrud (Kantrud) testified that he was presently incarcerated at the Centennial Corrections Facility, and has been there for approximately three and one-half years, serving a sentence for burglary and escape. Kantrud stated that he and White were housed in the same pod when Kantrud witnessed six officers enter White's cell and remain there for approximately two to three minutes. The officers subsequently brought White out of his cell and slammed White on the floor in front of Kantrud's cell. Each officer held one of White's hands or feet, and one officer held White by his hair, according to Kantrud, when they shackled White and slammed him into the wall a couple of times. Kantrud stated that White was not resisting the officers during this episode. Kantrud testified that he witnessed an event wherein officers broke the arm of a different prisoner.

Joseph Gonzales (Gonzales) testified that he was presently incarcerated at the Centennial Corrections Facility, and has been there for approximately three years, serving a sentence for aggravated robbery. Gonzales testified that he witnessed ten officers beat White. Gonzales testified that he could hear the officers bouncing White off the walls of White's cell, and could see the officers "stomping on him, cuffing him out, and carrying him out of there by the hands cuffed in

back of him and his legs shackled." Gonzales also testified to other acts of violence inflicted by officers on prisoners other than White.

Cordell Johnson (Johnson) testified that he was presently incarcerated at the Centennial Corrections Facility, and has been there for approximately four years, serving a sentence for first-degree assault and robbery. Johnson testified to various acts of violence inflicted upon him by officers and to the general living conditions at the facility.

Christopher Rodriguez (Rodriguez) testified that he was presently incarcerated at the Centennial Corrections Facility, and has been there for approximately five years, serving a sentence for first-degree murder. Rodriguez testified that he had been stabbed in the neck by another inmate at the facility who had been "put up to it" by an officer. Rodriguez testified that the officers at the facility did not like him because of the nature of the crime he committed, and, as a result, the officers regularly try to get inmates to harm him. Rodriguez said he had witnessed six officers run into White's cell during a shakedown, and beat White with their fists. Rodriguez also stated that the officers handcuffed White, threw him on the floor outside of his cell, and hit White on the side of the head. Rodriguez classified this as one of the worst beatings he had witnessed during his five years at the facility.

Gerald Moreland (Moreland) testified that he was presently incarcerated at the Centennial Corrections Facility, and has been there for approximately six years, serving a sentence for burglary and as a habitual criminal. On one occasion, Moreland testified that six or seven guards attacked him and repeatedly shocked him with a hand-held box called a "Tazer SR." Moreland testified that the beating rendered him unconscious, so other inmates began to yell for medical attention; however, Moreland did not receive medical attention for approximately one and one-half weeks.

Dr. Ingram testified that, in his capacity as a psychiatrist, he evaluated White twice, on September 10 and on September 14, 1989. The district court appointed Dr. Ingram to evaluate White in order to determine whether White's drug use history affected White's ability to knowingly, intelligently, and voluntarily enter a guilty plea. Dr. Ingram testified that, in 1987 and in 1988, White used a lot of cocaine, Dilaudid, and alcohol. As a result of his cocaine use, White became very paranoid, reacting to people who were not present and tearing apart his clothing because he believed that evidence had been planted on him. Dr. Ingram testified that White was once flown to a hospital in Denver in a helicopter as a result of his drug use. White additionally heard voices and experienced convulsive seizures. Dr. Ingram diagnosed White as having cocaine delusional disorder (or cocaine psychosis), a mental state which occurs during and after cocaine use wherein an individual becomes irrationally suspicious of others in the environment and may experience delusionary ideas of persecution. Dr. Ingram testified that, in the report he previously prepared for defense counsel, he concluded that White's drug use affected White's ability to knowingly, intelligently, and voluntarily enter a plea of guilty.

Dr. Ingram testified that he examined White again on March 16, 1991, in order to assist the defense in determining whether White was competent or legally insane. Dr. Ingram concluded that White was competent and legally sane at that time. Dr. Ingram testified that White first told him that Young killed Vosika in Cheyenne, Wyoming. White subsequently told Dr. Ingram that he shot Vosika in a garage at an apartment they shared in Pueblo on Bonnymede, using a handgun and putting a book between the gun and Vosika's head. White was more interested in discussing prison conditions than the events surrounding the Vosika homicide. Dr. Ingram noted that White's file at Centennial Correctional Facility included a psychiatric summary, diagnosing White as having a delusional paranoid disorder grandiose type (an affixed belief which is not congruent with reality and usually involves only one situation, one personality, or one group). Dr. Ingram did not necessarily agree with the diagnosis, in part on the ground that no other professional had diagnosed White as having that disorder. White indicated to Dr. Ingram that he wanted to plead guilty to

first-degree murder in order to change the conditions under which he was being forced to live, because he thought that they were intolerable. White hoped to be transferred as a result of presenting this information to the court by way of confession, or to be given the death penalty, which White viewed as being preferable to being beaten repeatedly. Dr. Ingram testified that White did not want to die, and that death was not White's primary purpose.

Dr. Ingram also testified on cross-examination that White's primary disorder is antisocial personality disorder. Based on this diagnosis, Dr. Ingram testified that White may be a danger to others in his location. Dr. Ingram also testified on cross-examination that White would "attempt to kill people in order to bring to light those things that he is unhappy with."

Counsel for White informed the court that counsel advised White not to testify in the present case. White, however, elected to testify. White presented extensive testimony on the subjects of the abject living conditions at Centennial and of physical abuse by officers directed at inmates.[5] His testimony was consistent with his position that he only wanted the death penalty as an alternative to remaining at Centennial for the duration of his life, subject to both the physical abuse and to the abject living conditions.

White specifically testified:

[Y]ou just don't kill cops in prison, but [the officers at Centennial] proved to me—and they know that that's why I'm in [administrative lock-up] that you got nothing to lose by killing a cop in the Colorado penitentiary, and they make their own jobs dangerous, because they're the ones that give you that attitude, because I would never considered [sic] killing a cop, and now I know I will, 'cause we're in a corner, and it's more justified for us to kill the cops in Colorado—well, especially at Centennial.

. . . .

... I know that the only way to change is to go to death row so I'm isolated so they don't have to write lies and discriminate against me and keep me down there, and you know and I know that I couldn't fight the temptation of killing one of the guards. I'll definitely kill one of those guards. Like I say, it's more justified—if war is justified, this is justified.

White stated that he viewed the act of killing a cop as an act of self-defense.

In his testimony, White did not express remorse for committing any of the homicides which he claimed that he committed. With respect to the Vosika homicide, White only testified that his father was upset that he gave a statement to Officer Perko because Officer Perko was running against his father in an election. White stated that he did not give a statement that he committed the crime in Wyoming in order to be transferred to a Wyoming prison. White testified on cross-examination that he would have shot the man in the red truck that had stopped near him, but not the woman and the child. At the conclusion of White's testimony, counsel for White rested, and final statements were given.

### Sentencing

On May 16, 1991, the district court held a hearing to deliver the sentence. The district court stated that a class 1 sentencing hearing was mandated by statute, and that the district court must conduct the sentencing hearing when an accused enters a plea of guilty which the court accepts.[6] The district court explained that it would read its written order to explain "the reasons for [the] sentence, what the standards are, and how they were applied." The district court thus stated:

The purpose of the standards that have to be applied by either a jury or the judge is to ensure that whatever decision is reached is a reliable decision. Reliable in the sense that the decision was not arrived at in the heat of passion or prejudice against an accused. These standards fur-

---

5. White presented approximately sixty-four pages of testimony.

6. Section 16–11–103(1)(a), 8A C.R.S. (1986), provides that, "if the defendant pleaded guilty, the hearing shall be conducted before the trial judge."

ther provide that the decision will be the result of the application of objective standards and not arbitrary and capricious.

. . . .

A Class 1 felony sentencing hearing mandates the sentencer, either the judge or jury, to make certain findings and conclusions based upon four separate steps. The first step is a determination beyond a reasonable doubt that certain statutory aggravating factors exist. In this case two statutory aggravating factors have been considered.

In the determination of these aggravating—statutory aggravating factors, I've applied the rules that apply to a jury in determining credibility and reasonable doubt, and I've discussed in my order the instructions that I would have read to a jury.

The first aggravating factor, which evidence was presented as to [section] 16–11–103(6)(b), [8A C.R.S. ( ] 1986[ ) ], and that factor states that, "The defendant was previously convicted in this state of a Class 1 or 2 felony involving violations as specified in Section 16–11–309."

... [T]here were two convictions. The first one concerns the El Paso County First–Degree Murder conviction. I've determined that that was established beyond a reasonable doubt. . . .

The El Paso County conviction for First–Degree Murder, a Class 1 felony, was accomplished by the use of a knife, and therefore I determined that it was a crime of violence pursuant to 16–11–309(2)(a)(1).

The second conviction is a conviction dated April 20. . . . It too established a conviction for First–Degree Murder After Deliberation. It also included a Judgment of Conviction for Attempted Murder in the First–Degree. These offenses were accomplished by the use of a firearm, and therefore, pursuant to statute, are crimes of violence.

I therefore concluded ... that—beyond a reasonable doubt that the statutory aggravator was established.

The second statutory aggravating factor is, "Whether or not the defendant commit-ted the offense in an especially heinous, cruel, or depraved manner." The legal standard that has been approved by the U.S. Supreme Court and the Colorado Supreme Court has limited that language to the standard of a "[conscienceless] or pitiless manner unnecessarily torturous to the victim" is the standard that has been approved.

The standard "heinous, cruel or depraved" itself has been determined to be too broad and therefore, any finding pursuant to that standard would be arbitrary and capricious, and I have, in accordance with Colorado Supreme Court and their decision in *People v. Davis* [, 794 P.2d 159 (Colo.1990), *cert. denied,* 498 U.S. 1018, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991) ], employed the limitations of "pitiless". . . . I considered all testimony presented during the Class 1 sentencing hearing. I considered—which, of course, includes your statements. . . .

The district court subsequently read that portion of its order describing the manner in which White killed Vosika and disposed of the body, conforming to the statements given to Officer Gomez. The district court subsequently stated that, "based upon its findings and evaluations of pertinent evidence[, it] is convinced beyond a reasonable doubt[ ] that the murder of Paul Vosika was committed in a [conscienceless] and pitiless manner, unnecessarily torturous to Paul Vosika." The district court subsequently stated that,

[s]ince the statutory aggravating factors I've just detailed have been established beyond a reasonable doubt, I'm required then to go to step II. There are four steps in this process. Step II requires consideration of mitigation—mitigating evidence. There is no burden of proof on any part[y] as to the existence or nonexistence of mitigation. I consider mitigation as follows: "Any evidence as to mitigation, regardless of its probative value, requires consideration pursuant to Step III." Thus, in this case "any" relevant evidence having been received, mitigating evidence exists.

Step III requires a sentencer to, "weigh any existing mitigating factors of record against statutory aggravating factors."

The legal standard that the Court was required to employ in this case is, "The obligation of being convinced beyond a reasonable doubt that, upon evidence received pursuant to [section] 16–11–103(a), sufficient mitigating factors do not outweigh proven statutory aggravating factors."

The district court subsequently found the following mitigating factors: (1) White was thirty-two years of age in August of 1987; (2) his capacity to appreciate wrongfulness was significantly impaired; (3) White's statement that he was enraged and did not know beforehand that he would kill Vosika that night; (4) the extent of White's cooperation with police officers in making several confessions; (5) White was both a drug and alcohol addict at the time of Vosika's murder; (6) White believed that his acts were morally justified; (7) sworn testimony exposed the brutal conditions at the DOC; (8) White does not want the death penalty imposed any more than any other individual; (9) White twice stated that he feels bad about killing Vosika; (10) White has reestablished ties with the Christian church; and (11) White has a good relationship with his parents.

The district court subsequently weighed all the mitigating factors against only the proven statutory aggravating factors. The district court then stated:

I'm convinced beyond a reasonable doubt that all mitigating factors of record do not beyond a reasonable doubt outweigh proven aggravating factors.

This requires that I proceed to Step IV, which is the last step.... The legal standard concerning this step is that, "There is no burden of proof on any party concern-

ing Step IV; however, the sentencer must be convinced beyond a reasonable doubt that a sentence of death is the appropriate sentence before such a sentence may be imposed."

The district court subsequently considered both the mitigating evidence and the aggravating evidence and found that

the measure of all evidence of record bearing on mitigation as determined by reasonable doubt does not, beyond a reasonable doubt, exceed or offset the measure of knowing, gratuitous violence Defendant has inflicted upon innocent victims.

... The Court concludes beyond a reasonable doubt that the sentence of death is appropriate.

The district court concluded the sentencing hearing by advising White that his sentence would be automatically reviewed by the supreme court. The instant appeal followed.

## II.

### LEGAL STANDARDS

White contends that the legal standard applied by the district court at the third step in the sentencing process, set forth in section 16–11–103(2)(a)(II), 8A C.R.S. (1986), violates his rights under the Due Process, Cruel and Unusual Punishment, and Ex Post Facto Clauses of both the Colorado and United States Constitutions.[7] Specifically, White contends that the district court introduced an improper standard into the sentencing process by inserting the phrase "beyond a reasonable doubt" into the phrase "all mitigating factors of record do not outweigh proven statutory aggravating factors."[8] We dis-

---

7. White articulated the following issues addressing this argument:

II. The trial court's imposition of the death penalty because mitigation did not, "beyond a reasonable doubt," outweigh aggravation, violated the death statute and the Due Process, Ex Post Facto and Cruel and Unusual Punishment Clauses of the federal and Colorado Constitutions.

III. The trial court's requirement that mitigation outweigh statutory aggravating factors "beyond a reasonable doubt" at the third step of the statutory process, or the court would proceed to the fourth step, violated the death statute and denied Mr. White his rights under

the Due Process and Cruel and Unusual Punishment Clauses.

IV. The trial court's application of the "beyond a reasonable doubt standard" of proof to mitigating factors violated the Due Process and Cruel and Unusual Punishment Clauses of the federal and Colorado Constitutions, and the death statute.

V. The trial court merely repeated the third step at the fourth step of the statutory process, violating the death statute and the Due Process and Cruel and Unusual Punishment Clauses of the federal and Colorado Constitutions.

8. *See* court's findings quoted *supra* p. 29.

agree. The standard articulated and applied by the district court in this case is consistent with the statutory standard as construed by this court in *People v. Tenneson*, 788 P.2d 786 (Colo.1990), and thus possesses the heightened certainty and reliability that is constitutionally required in capital sentences.

## A. *THE "BEYOND A REASONABLE DOUBT" STANDARD*

■ Section 16–11–103, 8A C.R.S. (1986 & 1987 Supp.),[9] provides the process by which sentences are imposed in capital cases where a defendant has been found guilty of a class 1 felony and a sentencing hearing has been conducted. *See People v. Tenneson*, 788 P.2d 786, 789 (Colo.1990). The process is defined as follows:

> (2)(a) After hearing all the evidence and arguments of the prosecuting attorney and the defendant, the jury shall deliberate and render a verdict based upon the following considerations:
>
> (I) Whether at least one aggravating factor has been proved as enumerated in subsection (6) of this section;
>
> (II) Whether sufficient mitigating factors exist which outweigh any aggravating factors found to exist; and
>
> (III) Based on the considerations in subparagraphs (I) and (II) of this paragraph (a), whether the defendant should be sentenced to death or life imprisonment.

§ 16–11–103(2)(a), 8A C.R.S. (1986). We have construed this section to require capital sentencers to follow a four-step process. *Tenneson*, 788 P.2d at 789; *see People v. District Court*, 834 P.2d 181, 185 (Colo.1992); *People v. Young*, 814 P.2d 834, 839–41 (Colo. 1991).

In *Tenneson*, we identified each of the four steps, noting that the statute first requires a jury to determine whether the prosecution has proven that at least one statutory aggra-

vating factor exists beyond a reasonable doubt. *Tenneson*, 788 P.2d at 789. Second, if the jury determines that the prosecution has proven that at least one statutory aggravating factor exists, "the jury must then consider whether any mitigating factors exist." *Id.* (citing § 16–11–103(2)(a)(II), –103(5)). "Third, the jury must determine whether 'sufficient mitigating factors exist which outweigh any aggravating factor or factors found to exist.'" *Id.* (quoting § 16–11–103(2)(a)(II)). Fourth, in the event that "the jury finds that any mitigating factors do not outweigh the proven statutory aggravating factors, it must decide whether the defendant should be sentenced to death or to life imprisonment." *Id.* (quoting § 16–11–103(2)(a)(III)).

In *Tenneson*, we were called upon to evaluate whether certain jury instructions given in regard to the third step of the sentencing process comported with the Eight Amendment's proscription against cruel and unusual punishment. The jury in that case was instructed "that in order to sentence the defendant to death they must be convinced beyond a reasonable doubt that the proven statutory aggravating factors outweigh any mitigating factors." *Id.* at 795. We noted that the statute providing the four-step process did not supply a standard with which to determine whether sufficient mitigating factors existed to outweigh any aggravating factor or factors. *Id.* at 789–90.

At the outset, we noted that federal constitutional standards are highly relevant in determining the meaning of our statute. *Id.* at 790. Additionally, we noted that the United States Supreme Court has never found that the United States Constitution requires a specific method for balancing mitigating factors against aggravating factors. *Id.* at 792 n. 9.[10] In order to comply with the Eighth Amendment's proscription against cruel and unusual punishments, we recognized that a

---

9. Since White entered a plea stating that he killed Vosika in late August or early September of 1987, the 1986 version of § 16–11–103 applies in this case.

10. The United States Supreme Court has consistently declined to impose on states a prescribed method of weighing aggravating versus mitigat-

ing circumstances. *Boyde v. California*, 494 U.S. 370, 377, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990) (relying on *Franklin v. Lynaugh*, 487 U.S. 164, 181, 108 S.Ct. 2320, 2331, 101 L.Ed.2d 155 (1988) (plurality opinion)); *Zant v. Stephens*, 462 U.S. 862, 890, 103 S.Ct. 2733, 2749, 77 L.Ed.2d 235 (1983).

statute must both limit the class of persons eligible for the penalty, and permit capital sentencers to consider any relevant mitigating evidence. *Id.* at 790 (relying on *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); *Blystone v. Pennsylvania,* 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990)). These requirements provide reliability and certainty in capital sentencing. *See Tenneson,* 788 P.2d at 790–91. Thus, in *Tenneson,* we observed:

> Because of the unique severity and finality of a sentence to death, the United States Supreme Court has emphasized the heightened need for sentencing reliability in capital cases. *See, e.g., Mills[ v. Maryland,* 486 U.S. 367, 376], 108 S.Ct. [1860,] 1870 [100 L.Ed.2d 384] [ (1988) ]; *Lowenfield,* 484 U.S. at 238–39, 108 S.Ct. at 550–51; *California v. Ramos,* 463 U.S. 992, 998–99, 103 S.Ct. 3446, 3451–52, 77 L.Ed.2d 1171 (1983); *Lockett[ v. Ohio],* 438 U.S. [586,] 604, 98 S.Ct. [2954,] 2964 [57 L.Ed.2d 973] [ (1978) ]; *Woodson[ v. North Carolina],* 428 U.S. [280,] 305, 96 S.Ct. [2978,] 2991 [49 L.Ed.2d 944] [ (1976) ]; *see also The Supreme Court, 1988 Term—Leading Cases,* 103 Harv.L.Rev. 137, 153 (1989) ("The Court has consistently invalidated sentencing provisions and procedures [in death penalty cases] that it has found unreliable."). . . . This concern for the reliability of a jury verdict of death finds expression in United States Supreme Court decisions requiring that a jury's determination to impose the penalty of death reflect the conviction of each juror, guided by constitutionally sufficient statutory

standards. *Gregg[ v. Georgia],* 428 U.S. [153,] 195, 96 S.Ct. [2909,] 2935 [49 L.Ed.2d 859] [ (1976) ]. Our own decisions also have recognized that "the unique severity and irrevocability" of the death sentence creates an "enhanced need for certainty and reliability" in its application. *People v. Drake,* 748 P.2d 1237, 1254 (Colo. 1988); *accord People v. Durre,* 690 P.2d 165, 173 (Colo.1984).

> Colorado's death sentencing statute must be construed in light of the strong concern for reliability of any sentence of death.

*Id.* at 791–92 (footnotes omitted); *see People v. Drake,* 748 P.2d 1237, 1254 (Colo.1988) (recognizing the need to ensure certainty and reliability in a criminal verdict); *People v. Durre,* 690 P.2d 165, 173 (Colo.1984) (stating that the need for reliability in a capital sentencing hearing is enhanced by the severity and finality of the punishment of death); *see also Zant v. Stephens,* 462 U.S. 862, 884–85, 103 S.Ct. 2733, 2746–47, 77 L.Ed.2d 235 (1983).[11] The third step of the process, we held, requires "each juror to make a judgment based on an assessment and comparison of the weightiness of each of the aggravating factors proven beyond a reasonable doubt and any mitigating factors that may exist." *Tenneson,* 788 P.2d at 791. We concluded:

> An instruction to the jury that they must be convinced beyond a reasonable doubt that any mitigating factors do not outweigh the proven statutory aggravating factors before a sentence of death can be imposed

11. In *People v. Durre,* 690 P.2d 165 (Colo.1984), for example, we stated that,

> [i]nasmuch as death as a punishment is unique in its severity and irrevocability, the need for reliability in a capital sentencing hearing conducted under section 16–11–103 takes on added significance. By virtue of the qualitative difference between death and any other permissible form of punishment, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." . . . A verdict in a capital case must be certain and its meaning and construction cannot be left to doubt or speculation.

*Id.* at 173 (quoting *Zant,* 462 U.S. at 884–85, 103 S.Ct. at 2747). We concluded in *Durre* that a jury must be clearly instructed as to the effect of

its verdict since the jury's determination regarding the existence of mitigating and aggravating circumstances "necessarily involves a determination of whether life imprisonment as opposed to a death sentence is justified." *Id.*

We reaffirmed our holding in *Durre* in *People v. Drake,* 748 P.2d 1237 (Colo.1988). We described our holding in *Durre* as "grounded firmly upon the need to ensure certainty and reliability in a criminal verdict . . . and upon the enhanced need for certainty and reliability in imposing the appropriate punishment in a capital case." *Drake,* 748 P.2d at 1254. We reiterated the observation we made in *Durre,* that the General Assembly as well has recognized the need for certainty and reliability in capital sentencing verdicts. *Id.* (relying on *Durre,* 690 P.2d at 173).

adequately and appropriately communicates the degree of reliability that must inhere in the balancing process.

*Id.* at 792. We cautioned, however, that the reasonable doubt standard should be referred to as a "burden of convincing the jury rather than a burden of proof" in order to avoid confusion. *Id.* at 795 n. 12. The present case differs, however, from *Tenneson* insofar as a judge, and not a jury, served as the capital sentencer.

The United States Supreme Court recently reviewed a sentence of death imposed by a trial judge in *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).[12] The defendant therein was convicted of first-degree murder by a jury and sentenced to death by the trial court under a statutory scheme requiring sentencing hearings to be conducted before the court alone. *Id.* at 642–43, 110 S.Ct. at 3051. The defendant contended to the Supreme Court that the state courts improperly applied an aggravator under the decisions of *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), and *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). The Supreme Court disagreed and stated:

> When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process. It is not enough to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face. That is the import of our holdings in *Maynard* and *Godfrey*. But the logic of those cases has no place in the context of sentencing by a trial judge. *Trial judges are presumed to know the law and to apply it in making their decisions.*

*Walton*, 497 U.S. at 653, 110 S.Ct. at 3057 (emphasis added). The Supreme Court thus declined to apply the rationales of its decisions regarding jury instructions in capital cases where the trial court had performed the sentencing function. The *Walton* Court

additionally concluded that, "even if a trial judge fails to apply the narrowing construction [of an aggravator] or applies an improper construction," the state appellate court need not vacate the sentence based on that error, as the state appellate court may reweigh the aggravating and mitigating evidence.[13] *Id.*

The United States Supreme Court previously recognized that judicial sentencing should create greater consistency in sentencing in capital cases because trial judges are more experienced in sentencing than juries. *Proffitt v. Florida*, 428 U.S. 242, 252, 96 S.Ct. 2960, 2966, 49 L.Ed.2d 913 (1976) (plurality opinion).

A review of the district court ruling, in light of the analysis of *Tenneson*, *Walton*, and *Proffitt*, reveals that the sentence given by the district court, and not a jury, in the present case possesses the requisite degree of certainty and reliability to satisfy constitutional concerns.

## B. *THE SENTENCING STANDARD IN THE PRESENT CASE*

■ On May 16, 1991, the district court issued a written order setting forth both the legal standard applicable to each step of the sentencing process, and its analysis of the legal standards as applied to the facts of the present case. In a section titled "Step III *(16–11–103[2][a][II] )*," the district court stated:

> Since mitigating factors are in the record and therefore exist, 16–11–103(2)(a)(II) (1986) applies (Step III), requiring the Court as sentencer to weigh any existing mitigating factors of record against statutory aggravating factors.

The district court continued by detailing the legal standard to be applied in the third step in subsection (1):

---

12. We have cited *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), as a plurality opinion. *See People v. Young*, 814 P.2d 834, 845 (Colo.1991). However, in the section of the opinion addressing the presumption

that trial judges accurately apply the law, a majority of the court concurred.

13. *See infra* part IV.B.

*Legal Standard*

Step III places no burden of proof on any party, but imposes upon the sentencer, before moving on to Step IV, the obligation of being *convinced beyond a reasonable doubt that, upon evidence received pursuant to 16–11–103(a), sufficient mitigating factors do not outweigh proven statutory aggravating factors.*

(Emphasis added.) The district court next identified and evaluated statutory mitigating factors, and other mitigating evidence. The district court specifically considered the following factors: [14] (1) White's age; (2) his capacity to appreciate the wrongfulness of his conduct; (3) White's emotional state; (4) the absence of any significant prior criminal record; (5) the extent of White's cooperation with law enforcement officers; (6) the influence of drugs or alcohol on White; (7) any belief by White of the moral justification of his acts; (8) whether White "is not a continuing threat to society"; and (9) any other evidence on the question of mitigation pursuant to section 16–11–103(1).

With respect to any other evidence of mitigation, the *district court considered*: (1) the testimony offered by White and other inmates regarding prison conditions at Centennial; (2) "White's wish to not be executed"; (3) White's remorse and reestablished religious ties; and (4) White's personal background. The district court subsequently provided its conclusion in subsection 5:

### CONCLUSION

The Court has considered not only the mitigating factors listed above but all miti-

gation of record and has weighed these factors against only the proven statutory aggravating factors and no others.

The Court, having considered the matter as required by law, is convinced beyond a reasonable doubt that all mitigating factors of record do not, beyond a reasonable doubt, outweigh proven statutory aggravating factors.

The district court articulated the appropriate legal standard at the outset of its analysis. The district court subsequently identified applicable statutory mitigating factors, including all mitigating evidence of record pursuant to section 16–11–103(5)(*l* ). The district court then stated that it conducted its evaluation as required by law, and concluded that the mitigating evidence did not outweigh the proven statutory aggravating factors. [15]

The fact that the district court did not incorporate the *Tenneson* language verbatim in its conclusion does not indicate that the district court failed to apply the correct legal standard when conducting its analysis. We presume that the district court applied the correct legal standard at the third step of the sentencing process in this case because the district court articulated the correct standard at the outset of its analysis, and applied and evaluated the pertinent statutory mitigating factors, including all mitigating factors of record. *See Arave v. Creech,* —— U.S. ——, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993) (holding that, when the sentencer is a judge rather than a jury, federal courts must presume that the judge knew and applied the law);

---

14. The list of mitigating factors employed by the district court corresponds to § 16–11–103(5)(a)–(*l* ), which defines the mitigating factors relevant to sentencing in capital cases. *See infra* part V.A.

15. At the hearing on May 16, 1991, the district court, when reading its written order, stated

Step III requires a sentencer to, "weigh any existing mitigating factors of record against statutory aggravating factors."

The legal standard that the court was required to employ in this case is, "The obligation of being convinced beyond a reasonable doubt that, upon evidence received pursuant to [section] 16–11–103(a), sufficient mitigating factors do not outweigh proven statutory aggravating factors."

The district court articulated the correct legal standard under our holding in *People v. Tenneson*, 788 P.2d 786 (Colo.1990), when beginning the discussion of the third step. The district court followed the form of its order, by reviewing the statutory mitigating factors as supported by the evidence, and all mitigation of record. The district court subsequently articulated its conclusion that it was "convinced beyond a reasonable doubt that all mitigating factors of record do not beyond a reasonable doubt outweigh proven aggravating factors." The district court, in its discussion of the sentence at the May 16 hearing, presented the same legal standards with respect to the third step as it did in its written order.

*Walton,* 497 U.S. at 653, 110 S.Ct. at 3057 (stating that trial judges are presumed to know the law and apply it in a capital case); *Segura v. People,* 159 Colo. 371, 376, 412 P.2d 227, 230 (1966) (stating a presumption exists that a trial court discharged its duties as required by law in a capital case). The record does not indicate that the sentence given by the district court lacks the certainty and reliability prerequisite to affirming a sentence of death under the Colorado and United States Constitutions. *See Proffitt,* 428 U.S. at 252, 96 S.Ct. at 2966. We thus find White's contentions unpersuasive.

### III.

### THE "PREVIOUS CONVICTION" STATUTORY AGGRAVATOR

■ White contends that the district court improperly characterized his convictions for first-degree murder in the cases of Victor Woods and Raymond Garcia as "previous convictions" under the statutory aggravator set forth in section 16–11–103(6)(b).[16] White contends that the language of subsection (6)(b) dictates that an accused must both commit an offense and be convicted of that offense prior to the commission of a capital offense in order for the conviction to be characterized as "previous" for the purposes of the statutory aggravator. We disagree.

Section 16–11–103(6)(b) neither specifies when an offense must be committed nor when a conviction must be obtained in order for such conviction to be characterized as "previous." Section 16–11–103(6)(b) states:

> (6) For the purposes of this section, aggravating factors shall be the following factors:
>
> . . . .
>
> (b) The defendant was previously convicted in this state of a class 1 or 2 felony involving violence as specified in section

16–11–309, or was previously convicted by another state or the United States of an offense which would constitute a class 1 or 2 felony involving violence as defined by Colorado law. . . .

We must determine, therefore, whether "previously convicted" refers to both offenses committed and convictions obtained prior to the date on which the defendant committed a capital offense. We are persuaded, based on the jurisprudence of other state courts and on a line of reasoning in United States Supreme Court cases, that "previous convictions" incorporates convictions existing at the time a sentencing hearing is conducted pursuant to section 16–11–103, regardless of the date on which the offense underlying the "previous conviction" occurred.

### A. *THE LAW OF OTHER JURISDICTIONS*

Several state supreme courts have defined a "previous" or "prior" conviction in the context of sentencing in capital cases. While the factual scenarios underlying their opinions differ, the state courts that have addressed the issue generally agree that "previous convictions" are convictions that exist at the time of sentencing.

The California Supreme Court has repeatedly rejected the argument that both the commission of and conviction for a murder must antedate a present capital offense in order to serve as a special-circumstance finding.[17] *People v. McLain,* 46 Cal.3d 97, 249 Cal.Rptr. 630, 757 P.2d 569 (1988), *cert. denied,* 489 U.S. 1072, 109 S.Ct. 1356, 103 L.Ed.2d 824 (1989); *People v. Grant,* 45 Cal.3d 829, 248 Cal.Rptr. 444, 755 P.2d 894 (1988), *cert. denied,* 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1006 (1989); *People v. Hendricks,* 43 Cal.3d 584, 238 Cal.Rptr. 66, 737

**16.** White specifically argues:

> VII. The trial court's consideration of aggravation which the death statute prohibits violated the death statute and Mr. White's other fundamental rights.
>
> XII. The court's use of the 'previous conviction' statutory aggravating factor was improper because neither alleged conviction occurred "previous" to the alleged murder in this case.

> XIII. The trial court's use of the paragraph (6)(b) factor was unfounded since neither alleged conviction was a "crime of violence" as required by the statute.

**17.** Under California Penal Code §§ 190.2 and 190.4, special circumstances serve the same function as aggravating factors under the Colorado statutory scheme.

P.2d 1350 (1987), *cert. denied*, 488 U.S. 900, 109 S.Ct. 247, 102 L.Ed.2d 236 (1988).

In *Grant*, the defendant killed Edward Halbert in May of 1980, and subsequently killed Bobby Floyd in October of 1980. The defendant was arrested for killing Floyd in May of 1982; detectives subsequently discovered the remains of Halbert. The defendant was later charged with the murder of Halbert. The defendant was found guilty of the murder of Floyd prior to the commencement of his trial for the murder of Halbert. *Grant*, 248 Cal.Rptr. at 455, 755 P.2d at 905. At his trial for the murder of Halbert, the defendant argued that his conviction for the murder of Floyd was not a "previous conviction" within the meaning of the California statute because Floyd was killed after the murder of Halbert. *Id.* The California Supreme Court rejected the defendant's construction of the statute based on its previous decision in *Hendricks*. *Id.*

In *Hendricks*, the defendant first murdered victims 1 and 2; the defendant subsequently murdered victims 3 and 4. The defendant argued that the murders of victims 3 and 4 could not serve as special circumstances because he neither committed nor was convicted of those offenses before he committed the present capital offense with respect to victims 1 and 2. *Hendricks*, 737 P.2d at 1356–57. The *Hendricks* court disagreed.

The California Penal Code then "define[d] the relevant special circumstance as, 'The defendant was previously convicted of murder in the first or second degree.' " *Id.* at 1357. The *Hendricks* court found that the function of the statutory section is to "circumscribe, as the Eighth Amendment requires (*Zant v. Stephens* (1983) 462 U.S. 862, 878, 103 S.Ct. 2733, 2743, 77 L.Ed.2d 235), the classes of persons who may properly be subject to the death penalty." *Id.* The *Hendricks* court stated:

> Defendant misconstrues the purpose of the provision, which he inaptly analogizes to statutes aimed at the habitual criminal. Unlike recidivism statutes, however, section 190.2(a)(2) is directed neither to deterring misconduct nor to fostering rehabilitation.

The unambiguous language and purpose of section 190.2(a)(2) thus require that a person such as defendant, already convicted of murder in a prior proceeding, must be considered eligible for the death penalty if convicted of first degree murder in a subsequent trial. *The order of the commission of the homicides is immaterial.*

*Id.* at 1357 (emphasis added) (citations omitted).

The Florida Supreme Court, in *Ruffin v. State*, 397 So.2d 277 (Fla.), *cert. denied*, 454 U.S. 882, 102 S.Ct. 368, 70 L.Ed.2d 194 (1981), determined the meaning of "prior" when applying the statutory mitigating circumstance of "no significant history of prior criminal activity." *Id.* at 283. The state argued that the trial court properly considered criminal conduct of the defendant that occurred after the murder for which the defendant was being tried. *Id.* The *Ruffin* court held that

> "prior" means prior to the sentencing of the defendant and does not mean prior to the commission of the murder for which he is being sentenced. The interpretation of "prior" advanced by [the defendant] is unreasonable particularly in view of the fact that a defendant may have committed a murder for which he is not apprehended until many years later and during the course of these years he may have a long history of significant criminal activity.

*Id.* (emphasis added).

In *Correll v. State*, 523 So.2d 562 (Fla.), *cert. denied*, 488 U.S. 871, 109 S.Ct. 183, 102 L.Ed.2d 152 (1988), the Florida Supreme Court rejected a defendant's argument that he had not been previously convicted of another felony. In *Correll*, the defendant killed four people in one criminal episode. The *Correll* court reasoned that, "[a]s to each crime, Correll had already been convicted of three capital felonies even though all four murders were committed in one episode." *Id.* at 568. The court concluded that the "previously convicted" aggravator properly applied to all of the murders.

In *Stephens v. Hopper*, 241 Ga. 596, 247 S.E.2d 92, *cert. denied*, 439 U.S. 991, 99 S.Ct. 593, 58 L.Ed.2d 667 (1978), the defendant

committed murder and armed robbery in May of 1973, prior to committing a second murder in August of 1974. The defendant was not, however, convicted of the first 1973 murder and armed robbery until after he committed the second 1974 murder. The defendant argued that he did "not have a 'prior record of conviction for a capital felony'" at the time he committed the second 1974 murder. *Id.*, 247 S.E.2d at 97. The Georgia Supreme Court identified the issue before them as "whether, in deciding if the appellant has 'a prior record of conviction for a capital felony' the jury should consider his record as of the moment of the crime or as of the time of sentencing." *Id.* In concluding that the jury should consider the record at the time of sentencing, the *Stephens* court reasoned that

> [t]o conclude otherwise would produce the intolerable result that an offender with no prior record could commit numerous separate murders one after the other before being apprehended, and then, at the trials for those murders, could *never* receive death under this aggravating circumstance even though convicted of each and every one of the murders.

*Id.*

The Supreme Court of Kentucky considered what constitutes a prior conviction in *Templeman v. Commonwealth*, 785 S.W.2d 259 (Ky.1990), a capital case. In 1980, the defendant robbed a store and killed one of the store's patrons. In 1984, the defendant was convicted of aggravated robbery, among other things. In 1988, the defendant went to trial for the 1980 murder, and the prosecution introduced the 1984 conviction for aggravated robbery as a prior conviction at the sentencing phase. *Id.* at 259–60. The *Templeman* court found that the jury, in deciding whether death was the appropriate penalty, properly considered any of the defendant's convictions "*which were final at the time of sentencing.*" *Id.* at 260 (emphasis added). The *Templeman* court reasoned that

> a defendant may have committed a murder for which he is not apprehended until many years later and during the course of those years may have a significant criminal history. Consequently, the trial judge was

correct in allowing the prosecution to introduce evidence of prior criminal convictions which occurred subsequent to the commission of the crime. The term ["]prior["] is the status of the defendant at the time of sentencing, not at the time of the commission of the charged crime.

The purpose of K.R.S. 532.025 is to allow evidence of all relevant and pertinent information so that the jury can make an informed decision concerning the appropriate sentence in a particular case. The jury should not sentence in a vacuum without knowledge of the past criminal record or other pertinent matters necessary to assess an appropriate penalty.

*Id.*

Relying on its prior decision in *State v. Brooks*, 541 So.2d 801 (La.1989), the Supreme Court of Louisiana rejected a defendant's argument that the jury could not have found that he had a prior murder conviction for a murder that he committed after he committed the murder for which he was then on trial. *State v. Wille*, 559 So.2d 1321 (La. 1990), *cert. denied*, ── U.S. ──, 113 S.Ct. 231, 121 L.Ed.2d 167 (1992). The Louisiana Supreme Court reiterated its rule that, if a conviction is obtained before the sentencing phase of a capital trial, then it may serve as an aggravator in a capital case. *Id.* at 1341.

The New Jersey Supreme Court similarly held in *State v. Biegenwald*, 110 N.J. 521, 542 A.2d 442 (1988), that the statutory language "has previously been convicted" does not require "previous convictions" to occur before the commission of the present offense in order to be used as valid statutory aggravators in capital cases. *Id.*, 542 A.2d at 446. Among other cases, the *Biegenwald* court relied on its prior decision in *State v. Bey*, 96 N.J. 625, 477 A.2d 315 (1984), wherein a defendant argued that the language "previously been convicted" meant prior to commission of the offense for which the defendant was currently charged. The *Biegenwald* court stated:

> We find no legislative history, decisional law, or policy considerations to recommend defendant's interpretation. We are satisfied *that the status of the prior conviction at the time of its intended use—the penal-*

*ty phase of the subsequent murder prosecution—is determinative.* The relevance of such a conviction ... inheres in the fact *that the conviction has occurred prior to the jury's consideration of the appropriate penalty to be imposed.*

*Biegenwald,* 542 A.2d at 446 (quoting *Bey,* 477 A.2d at 317). The *Biegenwald* court found its decision supported by other jurisdictions, including Arizona and Mississippi. *Id.* at 447 (relying on *State v. Gretzler,* 135 Ariz. 42, 659 P.2d 1, *cert. denied,* 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983); *Jones v. State,* 381 So.2d 983 (Miss.), *cert. denied,* 449 U.S. 1003, 101 S.Ct. 543, 66 L.Ed.2d 300 (1980)). The Arizona Supreme Court stated that " '[c]onvictions entered prior to a sentencing hearing may ... be considered regardless of the order in which the underlying crimes occurred ... or the order in which the convictions were entered.' " *Id.* (quoting *Gretzler,* 659 P.2d at 16 n. 2). Both the Arizona and Mississippi Supreme Courts based their holdings on the purpose—of adequately informing the sentencer of the defendant's behavioral propensities—that underlies capital sentencing statutes.

The Tennessee Supreme Court reasoned in *State v. Teague,* 680 S.W.2d 785 (Tenn.1984), *cert. denied,* 473 U.S. 911, 105 S.Ct. 3538, 87 L.Ed.2d 662 (1985), that the statutory language "previously convicted" in the Tennessee death penalty statute "clearly indicates that the date of the conviction, not of the commission of the crime, is the important factor. The order in which the crimes were actually committed is irrelevant, as long as the convictions have been entered before the sentencing hearing at which they are introduced into evidence." *Id.* at 789–90 (quoting *State v. Caldwell,* 671 S.W.2d 459, 465 (Tenn.), *cert. denied,* 469 U.S. 873, 105 S.Ct. 231, 83 L.Ed.2d 160 (1984)).

These decisions provide an instructive framework against which we construe the phrase "previously convicted" in the context of the Colorado capital sentencing statute.

### B. *THE COLORADO STATUTE*

■ Our primary task in construing a statute is to discern and effectuate the intent of the General Assembly. *People v. Davis,*

794 P.2d 159, 180 (Colo.1990), *cert. denied,* 498 U.S. 1018, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991); *People v. Terry,* 791 P.2d 374, 376 (Colo.1990). We look first to the plain language of the statute for guidance, *Davis,* 794 P.2d at 180; *Terry,* 791 P.2d at 376; however, when statutory language is ambiguous, we must consider the underlying purpose of the statute in order to ascertain the intent of the General Assembly. *Seaward Constr. Co. v. Bradley,* 817 P.2d 971, 973 (Colo.1991). Where statutory language is ambiguous, we will analyze the statute with full regard for the policy and purpose manifested in the statutory scheme, and will construe the statute to accomplish the purposes for which it was enacted. *B.B. v. People,* 785 P.2d 132, 138 (Colo.1990).

■ The purpose of a statutory aggravator generally is to provide rational criteria in order to narrow the class of persons eligible for the death penalty. *People v. Young,* 814 P.2d 834, 840 n. 5 (Colo.1991); *Davis,* 794 P.2d at 186; *People v. Tenneson,* 788 P.2d 786, 790 (Colo.1990); *see Blystone v. Pennsylvania,* 494 U.S. 299, 306–07, 110 S.Ct. 1078, 1083, 108 L.Ed.2d 255 (1990); *Lowenfield v. Phelps,* 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988); *Zant v. Stephens,* 462 U.S. 862, 878, 103 S.Ct. 2733, 2743, 77 L.Ed.2d 235 (1983). The United States Supreme Court has held that

To pass constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder."

*Lowenfield,* 484 U.S. at 244, 108 S.Ct. at 554 (quoting *Zant,* 462 U.S. at 877, 103 S.Ct. at 2742). The *Lowenfield* Court stated that "[t]he use of 'aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion." *Id.* The *Lowenfield* Court relied on the United States Supreme Court opinion in *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), wherein the Supreme Court upheld the Texas death penalty statute

on the ground that the scheme narrowed the categories of murders for which the death penalty may be imposed. *Jurek,* 428 U.S. at 270–71, 96 S.Ct. at 2955–56. The *Jurek* Court concluded that "[a] jury must be allowed to consider on the basis of all relevant evidence ... why a death sentence should be imposed." *Id.* at 271, 96 S.Ct. at 2956.

The *Jurek* Court relied in part on the Supreme Court's previous opinion in *Gregg v. Georgia,* 428 U.S. 153, 200–04, 96 S.Ct. 2909, 2938–40, 49 L.Ed.2d 859 (1976), wherein the Supreme Court rejected several challenges to the statutory aggravators in Georgia's sentencing scheme. The *Gregg* Court reasoned: "We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision." *Id.* at 204, 96 S.Ct. at 2939.

We have recognized that, through the aggravators set forth in section 16–11–103(6), the Colorado death penalty statute limits the class of persons eligible for the death penalty in order to ensure that any sentence to death imposed pursuant to that section does not contravene the Eighth Amendment's proscription against cruel and unusual punishments. *Young,* 814 P.2d at 840 n. 5; *Tenneson,* 788 P.2d at 790.

We are persuaded that, in order to arrive at a constitutional sentence, the phrase "previously convicted," in section 16–11–103(6)(b), must be construed to refer to any conviction or convictions obtained prior to the date on which a sentencing hearing is commenced in a capital case. Such a construction ensures that the capital sentencer has before it all relevant information with which to arrive at an appropriate sentence based on the character and background of the defendant. *See Childs v. State,* 257 Ga. 243, 357 S.E.2d 48, 61, *cert. denied,* 484 U.S. 970, 108 S.Ct. 467,

98 L.Ed.2d 406 (1987); *Stephens,* 247 S.E.2d at 97; *Templeman,* 785 S.W.2d at 260; *Biegenwald,* 542 A.2d at 446–47.

This construction is consistent with the language of section 16–11–103(1)(b), wherein the General Assembly provided:

All admissible evidence presented by either the prosecuting attorney or the defendant that the court deems relevant to the nature of the crime, and the character, background, and history of the defendant, including any evidence presented in the guilt phase of the trial, and any matters relating to any of the aggravating or mitigating factors enumerated in subsections (5) and (6) of this section may be presented. Any such evidence which the court deems to have probative value may be received, as long as each party is given an opportunity to rebut such evidence.

Under this section, the district court has broad discretion to admit relevant evidence.[18] *People v. Borrego,* 774 P.2d 854, 855 (Colo. 1989). We also find that this construction serves the purpose of providing a rational criterion by which to narrow the class of persons eligible for the death penalty because prior convictions will not be arbitrarily included or excluded from consideration based on the chronological order in which the convictions may have been obtained.

■■■ We therefore conclude that the district court did not err by finding that White's two prior convictions for first-degree murder—entered on April 8, 1988, and on April 12, 1988, before the commencement of the sentencing hearing in the Vosika case on April 24, 1991—were admissible pursuant to the statutory aggravator set forth in section 16–11–103(6)(b).[19]

---

18. In *People v. Saathoff,* 790 P.2d 804 (Colo. 1990), we concluded that a district court erred by ruling that section 16–11–103(1)(b) barred the admission of a defendant's prior criminal record. *Id.* at 807.

19. White additionally contends that the two first-degree murder convictions are not admissible pursuant to § 16–11–103(6)(b) because the prior convictions were not crimes of violence pursuant to § 16–11–309, 8A C.R.S. (1986). Section 16–11–103(6)(b) does not by its terms require that previous convictions actually be convictions for

crimes of violence. Rather, the subsection states:

The defendant was previously convicted in this state of a class 1 or 2 felony *involving violence as specified in section 16–11–309,* or was previously convicted by another state or the United States of an offense which would constitute a class 1 or 2 felony *involving violence as defined by Colorado law in section 16–11–309....*

(Emphasis added.) White's construction of this subsection is not supported by its plain language.

## IV.

### THE "ESPECIALLY HEINOUS" STATUTORY AGGRAVATOR

White contends that the district court's interpretation of the "especially heinous, cruel, or depraved" statutory aggravator violated section 16–11–103 and denied him his rights under the Cruel and Unusual Punishment, the Due Process, and the Ex Post Facto Clauses of the Colorado and United States Constitutions.[20] We conclude that the manner in which the district court applied the "especially heinous" statutory aggravator in this case was improper. We do not, however, find it necessary to vacate White's sentence based on this conclusion.

### A. *IMPROPER APPLICATION OF STATUTORY AGGRAVATOR*

 Section 16–11–103(6) specifies as one aggravator that "[t]he defendant committed the offense in an especially heinous, cruel, or depraved manner." § 16–11–103(6)(j). We considered whether a jury properly applied these statutory terms in *People v. Davis,* 794 P.2d 159 (Colo.1990), *cert. denied,* 498 U.S. 1018, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991), and in *People v. Rodriguez,* 794 P.2d 965 (Colo.1990), *cert. denied,* 498 U.S. 1055, 111 S.Ct. 770, 112 L.Ed.2d 789 (1991). In both of those cases, we considered whether the statutory terms provided sufficient guidance to capital sentencers, or whether the terms were unconstitutionally vague. *Davis,* 794 P.2d at 176–77; *Rodriguez,* 794 P.2d at 982–

83. We concluded that, in the context of the United States Supreme Court decisions in *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), and *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), a capital sentencer could not properly apply that aggravator without the benefit of a limiting instruction. *Davis,* 794 P.2d at 177; *Rodriguez,* 794 P.2d at 982–83.

In the present case, the district court relied on this court's holding in *Davis* when it set forth the legal standard regarding the "especially heinous" aggravator. In its analysis, the district court found that the prosecution had proven this statutory aggravator beyond a reasonable doubt based on three factors: (1) the nature of the relationship between White and Vosika; (2) the manner in which Vosika was killed; and (3) the way White disposed of the body. In reviewing the last factor, the district court discussed the actions White took after he shot and killed Vosika. We find that these actions, which occurred primarily on the day after the homicide, were not properly considered under the statutory language of section 16–11–103(6)(j).

 Our primary task in construing a statute is to give effect to the intent of the legislature. *People v. Schuett,* 833 P.2d 44, 47 (Colo.1992); *Davis,* 794 P.2d at 180; *People v. Guenther,* 740 P.2d 971, 975 (Colo. 1987). A statute should be interpreted to give consistent, harmonious, and sensible effect to all its parts. *Jenks v. Sullivan,* 826

---

The district court expressly found that both first-degree murder convictions involved violence as specified in § 16–11–309(2)(a)(I) (defining crimes of violence as those involving the use of a deadly weapon) insofar as one conviction involved the use of a knife and the other involved the use of a .38 caliber revolver.

20. White specifically contends that

VIII. The trial court's obvious misinterpretation of the "especially heinous, cruel or depraved" statutory aggravating factor violated the death statute and denied Mr. White his rights under the Cruel and Unusual Punishment and Due Process Clauses of the federal and Colorado Constitutions.

XV. The trial court's use of the "especially heinous" aggravating factor was improper since that factor violates the Cruel and Unusual Punishment and Due Process Clauses, and

the application of a new definition to Mr. White violates the Due Process and Ex Post Facto Clauses.

XVI. The trial court's interpretation and application of its "especially heinous" aggravating factor was manifestly erroneous and violated the death statute and the Due Process, Cruel and Unusual Punishment and Ex Post Facto Clauses of the federal and Colorado constitutions.

XVII. The "conscienceless or pitiless" aggravating factor announced in *People v. Davis,* and the different factor used by the trial court, are unconstitutionally vague, and to whatever extent they were used against Mr. White he was denied his rights under the Due Process and Cruel and Unusual Punishment Clauses of the federal and Colorado Constitutions.

P.2d 825, 827 (Colo.1992) (citing *People v. District Court*, 713 P.2d 918, 921 (Colo. 1986)). "When interpreting a statute each provision must be construed in harmony with the overall statutory scheme, so as to accomplish the purpose for which [the statute] was enacted." *People v. Johnson*, 797 P.2d 1296, 1297 (Colo.1990). Constructions leading to absurd results will not be followed. *City of Ouray v. Olin*, 761 P.2d 784, 788 (Colo.1988).

Subsection (6) of section 16–11–103 provides the list of aggravators that capital sentencers may consider in determining whether death or life imprisonment is the appropriate penalty in a class 1 felony case. The plain language of many statutory aggravators set forth in subsection (6) expressly focuses on the circumstances arising from the defendant's actions which result in the death of another person. For example, aggravator (6)(c) states that "[t]he defendant intentionally killed any of the following persons while such person was engaged in the course of the performance of his official duties." § 16–11–103(6)(c). Aggravator (6)(d) states that "[t]he defendant intentionally killed a person kidnapped or being held as a hostage." § 16–11–103(6)(d). Aggravator (6)(f) states that "[t]he defendant committed the offense while lying in wait, from ambush, or by use of an explosive or incendiary device." § 16–11–103(6)(f). Aggravator (6)(g) states that "[t]he defendant committed a class 1, 2, or 3 felony and, in the course of or in furtherance of such or immediate flight therefrom, he intentionally caused the death of a person other than one of the participants." § 16–11–103(6)(g). Aggravator (6)(i) states that, "[i]n the commission of the offense, the defendant knowingly created a grave risk of death to another person." § 16–11–103(6)(i).

The statutory aggravators evince a scheme which calibrates punishment based on events or circumstances arising from the defendant's actions that cause the death of another person. To construe aggravator (6)(j) as encompassing the defendant's acts occurring *a day after* the acts that caused the death of another runs contrary to the statutory scheme. We conclude that the district court erred by relying on White's actions with regard to disposal of the body occurring a

day after White killed Vosika. However, based on our decisions in *Davis* and *Rodriguez*, and on the Supreme Court's opinion in *Clemons v. Mississippi*, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), we decline to reverse the district court ruling, and do not vacate the sentence of death.

### B. *SENTENCING ANALYSIS*

In *Davis*, we stated that "[t]he invalidation on appeal of a statutory aggravator does not necessarily require the reversal of a death sentence." *Davis*, 794 P.2d at 177. We discussed the United States Supreme Court's analysis in *Clemons*, finding it dispositive of the defendant's contention, raised under the federal constitution, that his sentence to death must be vacated if a single aggravator was improperly submitted to the jury. *Id.* at 179. *Clemons*, we found, created three avenues for state appellate courts to pursue upon determining that a capital sentencer improperly considered a single statutory aggravator. *Id.; see Clemons*, 494 U.S. at 744–50, 110 S.Ct. at 1445–49. Accordingly, an appellate court

> may "reweigh" the aggravators and mitigators and determine whether death is appropriate. Second, it may apply "harmless error" analysis by considering whether, if the jury had not considered the invalid aggravator, it nonetheless would have sentenced the defendant to death. Finally, where the aggravator considered by the jury was improper because it was not given a constitutionally narrow construction, the reviewing court may apply another form of "harmless error" analysis and uphold the sentence if it finds, beyond a reasonable doubt, that had the aggravator properly been narrowed the jury would have returned a verdict of death.

*Davis*, 794 P.2d at 179. In *Davis*, we followed the third avenue and concluded that, based on the facts of that case as evaluated against a proper construction of the "especially heinous, cruel or depraved manner" statutory aggravator, the jury would have returned a verdict of death. *Id.* at 179–80.

In *Rodriguez*, we reiterated our interpretation of *Clemons*, that state appellate courts are not constitutionally compelled to vacate

death sentences after finding one statutory aggravator invalid. *Rodriguez,* 794 P.2d at 983. The jury therein was not given a limiting or narrowing construction of the statutory terms "especially heinous, cruel, or depraved." We applied harmless error analysis in *Rodriguez,* and concluded that inclusion of an invalid aggravator was harmless beyond a reasonable doubt based in part on the fact that there was overwhelming evidence supporting five valid aggravators. *Id.* at 984.

In the present case, we first consider "whether, if the [district court] had not considered the invalid aggravator, it nonetheless would have sentenced the defendant to death." *Davis,* 794 P.2d at 179. In following the second avenue of appellate review condoned in *Davis* and in *Clemons,* we are mindful of the fact that in the present case, unlike both *Davis* and *Clemons,* a district court performed the sentencing function. We believe that the evidence presented at the providency proceeding and at the sentencing hearing shows that the district court would have imposed a sentence of death based on White's two prior convictions for first-degree murder.

At the providency proceeding on April 24, 1991, Officer Gomez gave testimony that served as the factual basis for White's guilty plea. Officer Gomez testified that, according to White, Vosika had stolen things from his family and friends, and from White in order to sustain his drug habit. White believed that Vosika had stolen approximately $1,500 and two ounces of cocaine from White. Gomez testified that White had provided the details of the last minutes of Vosika's life, and how he had killed Vosika.

At the sentencing hearing, Officer Spinuzzi testified about White's statements describing how and why he killed Vosika. According to Officer Spinuzzi, White informed him that Vosika had forced White to flush narcotics down the toilet at 119 Bonnymede. White also stated that he and Vosika were in the kitchen at 119 Bonnymede when Vosika told White that he had "charged some dope" to White's name. White pulled a gun out of a drawer and forced Vosika to get on the kitchen floor. White was going to kill Vosika in the kitchen, but changed his mind and direct-

ed Vosika to crawl from the kitchen to the garage. Once inside the garage, White told Vosika that he would open the garage door and give Vosika a chance to run. White stated that he did this so Vosika would not get up and attempt to run. White approached Vosika who was laying on the garage floor, placed a couple of books on Vosika's head, and shot Vosika. White subsequently put a bag over Vosika's head, lined the trunk of his car with a shower curtain, wrapped Vosika's body in a mattress cover and put Vosika's body in the trunk of the car. During their conversation, White informed Officer Spinuzzi of the manner in which he disposed of Vosika's body. White also told Officer Spinuzzi that he had killed two people in Adams County, in Colorado Springs, and at the Hampton Inn.

At the sentencing hearing, Officers Gomez and Avery also testified regarding White's statements about the manner in which he killed Vosika. The statements indicated in part that White decided to murder Vosika based on the facts that Vosika had stolen money and drugs from White, had charged drugs to White's account, and had stolen from family and friends in order to procure drugs. All three officers testified that White did not express remorse when giving statements regarding the Vosika homicide.

Officer Snell testified that he investigated the murder of Raymond Garcia, who died as a result of a single gunshot to the back of his head while working at the Hampton Inn. Officer Snell also testified that Robert Martinez was shot in the head during this incident, but did not die. White informed Officer Snell that he shot both Garcia and Martinez. Officer Snell testified that White neither expressed remorse with respect to Garcia nor concern with respect to Martinez.

Assistant District Attorney Eberling testified at the sentencing hearing that White was convicted of second-degree assault while incarcerated, on May 12, 1989. White informed Eberling that he had killed three people and would do it again.

Officer Gomez testified at the sentencing hearing that White informed him that White killed Victor Lee Woods in Colorado Springs.

White stated that Woods approached him and asked him for a ride home while White was with a woman in a bar. After arriving home, Woods made a sexual advance to White while holding a knife. Woods grabbed White by his hair, threw White on the ground, and placed his foot on White's back. By acting scared, White was able to take the knife away from Woods. White stabbed Woods in his rib area and beat Woods after toying with him for half an hour.

Officer Gomez testified that White's statement regarding the Woods homicide reflected pleasure and not remorse. Officer Gomez testified that White confessed to killing two men many years prior to 1988, whose bodies were never discovered. White refused to inform Officer Gomez where the bodies were located. Officer Gomez testified that White stated, in a sarcastic voice, that he had been rehabilitated. White additionally informed Officer Gomez that he had committed an assault while in prison.

Counsel for White presented mitigating evidence. In his opening statement, counsel for White contended that White entered a plea of guilty not because of the overwhelming evidence of his guilt, but because he wanted to make the point that he would rather die than continue living subject to the treatment he was receiving in the Department of Corrections. Counsel for White indicated that White had served three years of two previous life sentences he received. Counsel for White also contended that the death penalty was not necessary in White's case because White does not present a threat to society as White would never be likely to be out of prison for the rest of his life.

Father Weber testified that he had known White for twelve to fourteen years in his capacity as a parish priest. Father Weber testified that he regularly met with White once every two or three months, and that White had changed as a result of his belief in God. Inmates Kantrud, Gonzales, Johnson, Rodriguez, and Moreland testified regarding the living conditions at the Centennial Corrections Facility.

Dr. William Ingram (Dr. Ingram) testified that, in his capacity as a psychiatrist, he evaluated White twice, on September 10 and on September 14, 1989. Dr. Ingram testified that, in 1987 and in 1988, White used a lot of cocaine, Dilaudid, and alcohol, and that White became very paranoid as a result. White additionally heard voices and experienced convulsive seizures. Dr. Ingram diagnosed White as having cocaine delusional disorder. Dr. Ingram concluded that White's drug use did affect his ability to knowingly, intelligently, and voluntarily enter a plea of guilty. Dr. Ingram testified that he examined White again on March 16, 1991, in order to assist the defense in determining whether White was competent or legally insane. Dr. Ingram concluded that White was competent and legally sane at that time. Dr. Ingram testified on cross-examination that White would "attempt to kill people in order to bring to light those things that he is unhappy with."

Counsel for White informed the court that counsel advised White not to testify in the present case. White, however, elected to testify. White presented extensive testimony on the subjects of the abject living conditions at Centennial and of physical abuse by officers directed at inmates. His testimony was consistent with his position that he only wanted the death penalty as an alternative to remaining at Centennial for the duration of his life, subject to both the physical abuse and to the abject living conditions. In his testimony, White did not express remorse for having committed any of the homicides that he stated that he committed.

As the record reveals, White's prior commission of two first-degree murders convinces us that, had the district court properly disregarded the manner in which White disposed of Vosika's body, it nonetheless would have determined that death was the appropriate sentence in the present case. *See Davis*, 794 P.2d at 179–80; *see also People v. Young*, 814 P.2d 834, 844 (Colo.1991) (quoting *People·v. Tenneson*, 788 P.2d 786, 791 (Colo. 1990)) (quoting *Satterwhite v. Texas*, 486 U.S. 249, 261, 108 S.Ct. 1792, 1800, 100 L.Ed.2d 284 (1988)) ("[T]he question [of] whether death is the appropriate sentence requires a profoundly moral evaluation of the defendant's character and crime."). Thus, the district court's discussion of the manner

in which White disposed of Vosika's body was harmless error. Our conclusion is supported by a review of the district court's sentencing analysis in the present case, wherein the district court concluded that death was the appropriate sentence based upon its assertion that "mitigation as determined by a reasonable doubt does not, beyond a reasonable doubt, exceed or offset the measure of knowing, gratuitous violence [White] has inflicted upon innocent victims."

At step I of its sentencing analysis, the district court noted that, as sentencer, it must be convinced that the prosecution has proven the existence of at least one statutory aggravating factor beyond a reasonable doubt. See § 16–11–103; Tenneson, 788 P.2d at 789. The district court first considered whether the prosecution proved, beyond a reasonable doubt, that White "was previously convicted in this state of a class 1 or 2 felony involving violence as specified in section 16–11–309," pursuant to section 16–11–103(6)(b). The district court found that exhibit 20, which the prosecution produced, contained two judgments of convictions, accompanied by a certificate of the Custodian of Records at the Colorado Department of Corrections. The district court found that one judgment of conviction involved first-degree murder accomplished by the use of a knife. The district court noted that this was a crime of violence pursuant to section 16–11–309 for which White received a sentence of life imprisonment. The district court found that the second judgment of conviction established convictions for first-degree murder after deliberation, aggravated robbery, and attempted first-degree murder. The district court noted that the murder and attempted first-degree murder involved the use of a .38 caliber revolver and were therefore crimes of violence under section 16–11–309. The district court concluded that section 16–11–103(6)(b) had been proven beyond a reasonable doubt.

The district court proceeded to step II, to determine the existence of mitigating factors. See § 16–11–103; Tenneson, 788 P.2d at 789.

The district court found that mitigating evidence existed, and thus proceeded to step III.

Under step III, the district court noted that it must be "convinced beyond a reasonable doubt that ... sufficient mitigating factors do not outweigh proven statutory aggravating factors." The district court extensively reviewed the statutory mitigating factors and the mitigating evidence in the record, and considered that, among other things: (1) White was thirty-two years of age in August/September of 1987; (2) according to defense expert Dr. Ingram, White was competent when making his confessions and did not suffer from a mental disorder at the time of the murder; (3) White suffered from an antisocial personality disorder which caused him to act out; (4) White was enraged that Vosika charged cocaine purchases to his account; (5) White voluntarily contacted the police and made separate confessions regarding the murder of Vosika; (6) White was both a drug and alcohol addict at the time of the murder; (7) White believes that Vosika caused White to become addicted to drugs, and purposely exploited friends and relatives to obtain drugs; and (8) White is not a continuing threat to society because he will remain in protective custody for many years.[21]

Under section 16–11–103(5)(l), the statutory mitigating factor permitting "any other evidence which in the court's opinion bears on the question of mitigation," the district court considered, among other things: (1) extensive evidence offered by White regarding prison conditions and White's admission of guilt in part as a means to request death and escape the prison conditions; (2) that, despite his repeated requests, White did not actually want the death penalty; (3) that White has reestablished ties with the Catholic church and twice has expressed remorse for having killed Vosika; and (4) White's personal background.

The district court was aware of White's two prior convictions of first-degree murder

21. In weighing this mitigating factor, however, the trial court also noted that White had been convicted of an assault with a sledgehammer upon a fellow inmate while in protective custody in the presence of armed prison guards. The court stated that it considered this conviction only as it related to this mitigating factor.

of Victor Lee Woods and Raymond Garcia, occurring in January and April of 1988, respectively, approximately five months after the murder of Vosika. We find that, based on the record in this case, the district court would have been convinced beyond a reasonable doubt that the twelve mitigating factors it considered do not outweigh the proven statutory aggravating factor. We find that the district court would have been required to proceed to the fourth step.

As the fourth step requires, the district court considered whether the defendant should be sentenced to death or life imprisonment. The district court stated:

Undoubtedly defendant is emotionally tormented by guilt for his past crimes and has made sincere efforts to change and for absolution through religion and multiple confessions. These efforts have been considered in the Court's measure of mitigation. Also considered is defendant's recovery from a drug addiction in spite of his prior heavy drug use. Also the Court is aware of defendant's present and probably future living conditions. The Court's consideration of mitigation has also included the fact that neither Mr. White, his parents, nor a Catholic priest want the sentence of death to be imposed. Moreover, it is evident that Mr. White is compassionate for the living conditions imposed upon mentally ill and other disadvantaged inmates at the Department of Corrections. But, the measure of all evidence of record bearing on mitigation as determined by reasonable doubt does not, beyond a reasonable doubt, exceed or offset the measure of knowing, gratuitous violence defendant has inflicted upon innocent victims. The intensity of defendant's violence has resulted in two prior first-degree murder convictions for the murder of two persons. In the present case, defendant's violence was inflicted in a pitiless and torturous manner upon a helpless friend. The Court concludes beyond a reasonable doubt that the sentence of death is appropriate. Accordingly, the sentence of death shall be and the same is hereby imposed.

22. We reach our conclusion in the present case beyond a reasonable doubt. *See People v. Rodriguez,* 794 P.2d 965, 983 (Colo.1990), *cert. denied,*

In its discussion of the fourth step, the district court made only one reference to the manner in which White killed Vosika and disposed of the body. *Cf. Clemons,* 494 U.S. at 753, 110 S.Ct. at 1450. Based on the record, we conclude[22] that the district court would nonetheless have concluded beyond a reasonable doubt that death was the appropriate sentence if it had not considered the especially heinous statutory aggravator. *See People v. O'Neill,* 803 P.2d 164, 178 (Colo. 1990) (holding that a capital sentencer must conclude beyond a reasonable doubt that death is the appropriate punishment at the fourth step).

## V.

## INDEPENDENT REVIEW

We find it appropriate at this juncture to conduct an independent review of the propriety of the sentence pursuant to section 16–11–103(7)(a) and (b), and C.A.R. 4(e). *See Davis,* 794 P.2d at 212.

Based on our extensive review of the record in parts I. and IV.B., we are convinced that the district court properly determined that death was the appropriate penalty. *See id.* at 213. The prosecution proved that White had twice been convicted of first-degree murder, and thus proved a statutory aggravating factor beyond a reasonable doubt. The mitigating factors previously discussed were properly found insufficient to outweigh the proven statutory aggravator. Based on our presumption that the district court knew the law and applied it correctly, we do not find that the sentence of death was imposed pursuant to an arbitrary factor.

## VI.

## MITIGATING EVIDENCE

White contends that the district court employed an exceedingly narrow definition of

498 U.S. 1055, 111 S.Ct. 770, 112 L.Ed.2d 789 (1991).

mitigating evidence, and suppressed critical mitigating evidence.[23] We disagree.

## A. *THE DEFINITION OF MITIGATING EVIDENCE*

■ White contends that the district court "defined 'mitigation' as … including only matters which reduced the degree of moral culpability for the offense with which the accused was convicted." White contends that, as a result of its narrow definition, the district court failed to consider the possibility that White's confessions were motivated by the treatment White received from officers at Centennial.

Section 16–11–103(5) defines mitigating factors as

(5) For purposes of this section, mitigating factors shall be the following factors:

(a) The age of the defendant at the time of the crime; or

(b) His capacity to appreciate [the] wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution; or

(c) He was under unusual and substantial duress, although not such duress as to constitute a defense to prosecution; or

(d) He was a principal in the offense which was committed by another, but his participation was relatively minor, although not so minor as to constitute a defense to prosecution; or

(e) He could not reasonably have foreseen that his conduct in the course of the commission of the offense for which he was convicted would cause, or would create a grave risk of causing, death to another person; or

(f) The emotional state of the defendant at the time the crime was committed; or

(g) The absence of any significant prior conviction; or

(h) The extent of the defendant's cooperation with law enforcement officers or agencies and with the office of the prosecuting district attorney; or

(i) The influence of drugs or alcohol; or

(j) The good faith, although mistaken, belief by the defendant that circumstances existed which constituted a moral justification for the defendant's conduct; or

(k) The defendant is not a continuing threat to society; or

(*l*) Any other evidence which in the court's opinion bears on the question of mitigation.

§ 16–11–103(5)(a)–(*l*). We have stated that, "in order to achieve constitutional validity, a capital sentencing scheme must allow the sentencing body to consider any relevant mitigating evidence regarding the defendant's character and background and the circumstances of the offense." *People v. Tenneson*, 788 P.2d 786, 790 (Colo.1990) (relying on *Boyde v. California*, 494 U.S. 370, 377, 110 S.Ct. 1190, 1196, 108 L.Ed.2d 316 (1990)); *see Blystone v. Pennsylvania*, 494 U.S. 299, 304–05, 110 S.Ct. 1078, 1082–83, 108 L.Ed.2d 255 (1990); *Mills v. Maryland*, 486 U.S. 367, 374–75, 108 S.Ct. 1860, 1865–66, 100 L.Ed.2d 384 (1988) (citing *Eddings v. Oklahoma*, 455 U.S. 104, 114, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982); *Skipper v. South Carolina*, 476 U.S. 1, 4, 106 S.Ct. 1669, 1670, 90 L.Ed.2d 1 (1986)). Thus, we have recognized that this list is only a guide and, by the plain language of subsection (*l*), is not exclusive. *Tenneson*, 788 P.2d at 791 n. 6.

In its written order, the district court stated

---

23. White specifically contends that

VI. The suppression of mitigation evidence by the trial court, and its refusal to consider critical mitigation evidence, violated the death statute and denied Mr. White his rights under the Cruel and Unusual Punishment and Due Process Clauses of the federal and Colorado Constitutions.

IX. The trial court employed an exceedingly narrow definition of mitigation, thus denying Mr. White his rights under the death statute

and the Cruel and Unusual Punishment and Due Process Clauses of the federal and Colorado Constitutions.

XIV. The court's findings that Mr. White's statements to police were exaggerated, and that the possibility existed that Mr. White did not commit the crime, and the court's odd decision to consciously ignore those prominent facts of this case, demonstrate the unreliability and unfairness of the death sentence.

The Court has now resolved its findings beyond a reasonable doubt as to Step I and must now move on to Step II to determine the existence of mitigating factors. As to the existence or non-existence of such factors, there is no burden of proof or burden of persuasion, *and thus "any" evidence as to mitigation, regardless of its probative value*, requires consideration pursuant to Step III. Thus, in this case "any" relevant evidence having been received, mitigating evidence exists.

The district court subsequently defined mitigating circumstances as "circumstances which do [not] constitute a justification or excuse for the offense in question, but which in fairness or mercy may be considered as extenuating or reducing the degree of moral culpability." The district court cited *People v. Rodriguez*, "794 P.2d 961 [965] [sic]," as the source for the definition. The definition in fact appears on page 987 of that case, which begins on page 965. In *Rodriguez*, this definition of mitigating circumstances appeared in a jury instruction which we determined was "more explicit and favorable to the defendant than the instructions found constitutionally adequate in *Boyde v. California*, 494 U.S. at 382–386, 110 S.Ct. at 1199–1201." *Rodriguez*, 794 P.2d at 987. We concluded that the trial court in *Rodriguez* did not err by giving that instruction to the jury. Based on our observation in *Rodriguez*, we similarly conclude here that the district court's use of this definition is not error.

## B. SUPPRESSION OF MITIGATING EVIDENCE

■■■ White contends that the district court erroneously suppressed mitigating evidence concerning: (1) the "sadistic, brutal and torturous treatment of prisoners"; (2) the facts surrounding the death of Mr. Vosika; and (3) evidence that the "confessions" of Mr. White were "bogus and unreliable."

At the beginning of the sentencing hearing on April 24, 1991, the district court conducted a providency hearing wherein the district court asked White whether he understood that he was admitting the truth of the charge by entering a plea of guilty. White indicated that he did understand. During the provi-

dency hearing, the prosecution called Officer Gomez as a witness, who testified as to the facts White recounted in his statement to Gomez. Counsel for White subsequently conceded that "[a] jury in a court that had proper jurisdiction could convict [White] based on the statements that Mr. White made." White, through his counsel, waived further formal proof as to the factual basis of his plea.

At the sentencing hearing, counsel for White sought to introduce the testimony of: (1) Officer Lipich, who purportedly gave White a polygraph test and specifically asked White whether he killed Vosika; (2) Jim Crane, the landlord at 119 Bonnymede; (3) Mike and Francis Steele, who would testify that they saw White with Vosika in October or November of 1987, after the date upon which White allegedly killed Vosika; and (4) Officers Snell and Spinuzzi. The district court excluded the potential testimony of Officer Lipich, Jim Crane, and the Steeles on the ground that it addressed the issue of guilt or innocence, which the district court had already determined.

The district court subsequently heard the testimony of Steven Kantrud, Joseph Gonzales, Cordell Johnson, Christopher Rodriguez, Gerald Moreland, and White, all prisoners at Centennial, who testified to the brutal treatment received by inmates at Centennial. In its written order, the district court stated that

Defendant has stated on many occasions, and offered sworn testimony, that a reason for pleading guilty is the opportunity afforded by these proceedings to expose brutal conditions at the Department of Corrections. Since there is evidence [that] Defendant has in part admitted guilt in order to request death as a means to escape these conditions, the issue of involuntariness is raised; that is, prison conditions may have forced the defendant to either confess to a crime he did not commit or state fictional aggravating circumstances. While this issue may also be relevant to the providency hearing, the possibility of circumstances having been inflated by defendant to create an aggravator, if true,

constitutes the ultimate mitigator[:] no statutory aggravated factors.

The district court detailed the evidence presented by White concerning conditions at Centennial.

We have stated that "[t]he plain language of section 16–11–103(1)(b) grants the trial judge wide discretion to determine what evidence is relevant and admissible." *People v. Borrego,* 774 P.2d 854, 855 (Colo.1989) (upholding the trial court's ruling prohibiting the prosecution from introducing evidence of the circumstances surrounding an aggravated robbery). "Consistent with the broad grant of discretion in section 16–11–103(1)(b), ... the trial court's decision to exclude evidence in a sentencing hearing will not be reversed absent an abuse of that discretion." *Id.* at 855–56. "[A] trial court's actions amount to an abuse of discretion when the actions are 'manifestly arbitrary, unreasonable or unfair.'" *Colorado Nat'l Bank v. Friedman,* 846 P.2d 159, 167 (Colo.1993) (quoting *Nagy v. District Court,* 762 P.2d 158, 161 (Colo.1988)). Based on White's plea of guilty as accepted by the district court at the close of the providency hearing, and the lengthy testimony presented regarding conditions at Centennial at the sentencing hearing, White's contentions do not persuade us that the district court's actions in excluding the proffered testimony were manifestly unreasonable or arbitrary. We reject White's contentions.

## VII.

### BURDEN OF PROOF

■ White contends that the district court failed to place the burden of proof on the prosecution with respect to the third and fourth steps of the sentencing process.[24] We disagree. White confuses a burden of proof placed *on a party* to the case with a standard we have *imposed on juries,* requiring juries to make decisions pursuant to the third and

fourth steps of the sentencing process with a high degree of certainty in order to ensure the reliability and certainty of those decisions.

Section 16–11–103 does not expressly state that a burden of proof exists with respect to either the third or fourth steps of the sentencing process. § 16–11–103(2)(a)(II), (III). We discussed at length the obligation imposed by, and the purposes served by, the third and fourth steps of the sentencing process in *People v. Tenneson,* 788 P.2d 786 (Colo.1990). We repeat the third and fourth steps as articulated in *Tenneson:*

> Third, the jury must determine whether "sufficient mitigating factors exist which outweigh any aggravating factor or factors found to exist." § 16–11–103(2)(a)(II). Fourth, and finally, if the jury finds that any mitigating factors do not outweigh the proven statutory aggravating factors, it must decide whether the defendant should be sentenced to death or to life imprisonment. § 16–11–103(2)(a)(III).

*Id.* at 789. In *Tenneson,* we observed that the statute "describes the decision process as one of weighing." *Id.* at 791. We noted that "the question [of] whether death is the appropriate sentence requires a profoundly moral evaluation of the defendant's character and crime." *Id.* at 791 (quoting *Satterwhite v. Texas,* 486 U.S. 249, 261, 108 S.Ct. 1792, 1800, 100 L.Ed.2d 284 (1988) (Marshall, J., concurring in part and concurring in the judgment)). Thus, we concluded that the third step "requires each juror to make a judgment based on an assessment and comparison of the weightiness of each of the aggravating factors proven." *Tenneson,* 788 P.2d at 791. We noted in *Tenneson* that the United States Supreme Court has not declared "'that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required.'" *Id.* at 792 n. 9 (quoting *Frank-*

24. White expressly contends that
 X. The trial court's failure to place the burden of proof on the state to show that Mr. White should be killed violated the controlling statute and the Due Process and Cruel and Unusual Punishment Clauses of the federal and Colorado Constitutions.

XI. The trial court's failure to place the burden of proof on the state to show that mitigation did not outweigh aggravation violated the controlling statute and the Due Process and Cruel and Unusual Punishment Clauses of the federal and Colorado Constitutions.

*lin v. Lynaugh*, 487 U.S. 164, 179, 108 S.Ct. 2320, 2330, 101 L.Ed.2d 155 (1988)).

We were persuaded in *Tenneson* that the unique severity and finality of the death penalty demands that a death sentence be both certain and reliable. *Id.* at 791–92 (relying on *Lowenfield v. Phelps*, 484 U.S. 231, 238–39, 108 S.Ct. 546, 551–52, 98 L.Ed.2d 568 (1988)). We concluded that a capital sentencer, in order to deliver a certain and reliable sentence, must be convinced beyond a reasonable doubt that any mitigating factors do not outweigh proven statutory aggravating factors. *Id.* at 790–96. In so concluding, we did not place on either party a burden of proof. In fact, we compared by analogy the high degree of certainty with which a capital sentencer must determine the appropriate penalty with the burden of proof of facts in criminal proceedings. *Id.* at 794–95. We endeavored to distinguish fact-finding from the process of weighing mitigating and aggravating factors. *Id.* at 793–94.

With respect to the fourth step, in *Tenneson*, we emphasized that, after completion of the third step, a capital sentencer must still "be convinced beyond a reasonable doubt that the defendant should be sentenced to death." *Id.* at 797. We did not assign any burdens of proof to either party; we reiterated that the purpose of the "beyond a reasonable doubt" standard at the fourth step "is not to fulfill the traditional function of providing guidance in fact-finding but is to communicate to the jurors the degree of confidence they must have in the correctness of their ultimate conclusion before they can return a verdict of death." *Id.* at 796.

We followed *Tenneson* in *People v. O'Neill*, 803 P.2d 164 (Colo.1990), wherein we held that "[t]he purpose of requiring a high burden of persuasion in the fourth step is not simply to guard against unreliability in the event of equipoise, but rather to ensure the reliability of any jury decision sentencing a defendant to death." *O'Neill*, 803 P.2d at

179. Like *Tenneson*, the defendant in *O'Neill* challenged the propriety of instructions given to the jury. We reiterated our statement in *Tenneson* wherein "[w]e stated, 'The purpose of these instructions is not to fulfill the traditional function of providing guidance in fact-finding but is to communicate to the jurors the degree of confidence they must have in the correctness of their ultimate conclusion before they can return a verdict of death.'" *Id.* at 178.

■ Recognition of a burden of proof on the prosecution at the fourth step would contravene the constitution insofar as it would require a capital sentencer to impose a sentence of death if it found that the prosecution had proven that mitigation was outweighed by proven statutory aggravating factors at the conclusion of the third step. The purpose of the fourth step is precisely contrary to that; it requires a capital sentencer to continue deliberating and to consider whether a "defendant's character and crime result[ ] in a conclusion beyond a reasonable doubt that the defendant should be sentenced to death." *People v. Young*, 814 P.2d 834, 844 n. 8 (Colo.1991). Imposition of a burden of proof at the fourth step would lead to the impermissible result of mandatory sentencing. *See Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). We thus decline to impose a burden of proof.

## VIII.

### COMPETENCY

■ White argues that the district court deprived him of several constitutional rights, including the rights to counsel and to due process, by refusing to appoint a mental health examiner to evaluate White's competency and prepare possible mental health defenses.[25] White also contends that "[t]he

---

**25.** White specifically contends that

XVIII. The trial court's ruling that Mr. White could and did waive his right to be competent during his plea and sentencing, after the court had previously ruled that a determination of his competency was required, violated the death statute, the competency statute,

the Due Process and Cruel and Unusual Punishment Clauses.

XXI. The court's refusal to provide a psychiatrist for Mr. White pursuant to C.R.S. § 16–8–106, –108, –110 and –111, to assist him in the competency proceeding, and to allow defense counsel to investigate the sanity and

[district] court's ruling that [White] waived his right to proceed while competent by objecting to a delay in the proceedings is . . . constitutionally indefensible" because "[n]o person can waive the right to be competent." We find no error.

The district court held a hearing on April 17, 1990, wherein counsel for White questioned White's competency based on his "wildly contradictory" confessions; counsel correspondingly requested that a competency examination be performed prior to a preliminary hearing. Two days later, the district court entered an order directing the Colorado State Hospital to perform a competency evaluation of White pursuant to section 16–8–106, 8A C.R.S. (1986). On June 5, 1990, the district court entered an order finding White competent to proceed based on a report written by a state hospital staff psychiatrist, Dr. Seymour Sundell.

On June 15, 1990, White filed a motion requesting the district court to issue an order authorizing a second psychiatric evaluation of White to be conducted by a psychiatrist of White's own selection pursuant to section 16–8–108, 8A C.R.S. (1986). The People opposed this on the grounds that White did not have an absolute right to an appointment of a psychiatrist of his own choosing. The People also contended that White did not demonstrate "good cause" for the need of a second opinion. On July 23, 1990, the district court entered an order wherein it found that good cause was not a prerequisite to ordering a psychiatric evaluation pursuant to section 16–8–108. The district court ordered that Dr. William Ingram be given a reasonable opportunity to conduct a psychiatric examination of White, and that the expense of the examination be paid by the State of Colorado. On November 14, 1990, White filed a motion for payment of a psychiatrist, on the ground that White was an indigent and could not afford to retain a psychiatrist prior to any determination by counsel regarding whether pleas of not guilty by reason of insanity or not guilty by reason of impaired mental condition existed.

On January 15, 1991, White requested that one of three psychiatrists, including Dr. Ingram and Dr. Kathy Morall, be "appointed to assist him in connection with any death penalty hearing which may be held." On February 12, 1991, the district court entered an order appointing Dr. Ingram to examine White pursuant to section 16–8–108. The order referenced a stipulation submitted to the district court by the People on January 8, wherein the People agreed that the findings and conclusions of such a psychiatrist would be confidential and disclosed only to White's counsel. The district court order also provided that

> Dr. Ingram shall prepare a written report of his examination which addresses the issues of insanity, impaired mental condition, and competency, but that report shall not be filed with this Court. Said report shall be furnished to the Defendant's attorneys of record and shall be a confidential communication between Dr. Ingram and said attorneys. . . .

The district court simultaneously entered an order appointing Dr. Morall to conduct an evaluation of White and submit to the district court a report stating whether White was competent to proceed to a providency hearing.

On February 26, 1991, White filed a motion seeking approval of an hourly fee of $80.00 for Dr. Ingram. The district court entered an order authorizing payment of the defense psychiatrist's hourly rate, which was in excess of standard court compensation of experts. On March 22, 1991, the district court entered an order setting a providency hearing for White's plea on April 23, to be followed by a sentencing hearing should the district court accept White's plea.

On April 16, 1991, the district court entered an order staying its previous order directing Dr. Morall to conduct a competency examination. The district court based its ruling on the grounds that: (1) White opposed a continuance and waived any further competency examinations; and (2) the district court had previously found that White

impaired mental condition issues, violated the statute and denied Mr. White his rights under the Due Process, Equal Protection, Right to

Counsel and Cruel and Unusual Punishment Clauses of the Colorado and federal Constitutions.

was competent on June 5, 1990, based on Dr. Sundell's report. On April 17, 1991, White filed a withdrawal of his request for a competency hearing on the grounds that "he does not intend to pursue his claim that he is mentally incompetent to proceed. [White] admits that he is not able to sustain the burden of proof of showing that he is incompetent."

A review of the record reveals that the district court did appoint Dr. Ingram pursuant to section 16–8–108, to assist White in the preparation of possible mental health defenses. White's second contention—that no person can waive the right to be competent—does not take into consideration the fact that White had already been found competent by Dr. Sundell, and had been examined by Dr. Ingram for the express purpose of evaluating competency, when he waived the right to have a *third* competency evaluation performed by Dr. Morall. Based on these facts, we find no error and reject White's contentions. *See People v. Mack,* 638 P.2d 257, 263 (Colo.1981) ("[D]ue process or the defendant's right to effective assistance of counsel [do not] require[ ] the court to grant a request for a second competency determination after the accused already has been granted an adequate hearing on his claimed incompetency.").

## IX.

### RIGHT TO BE PRESENT

White contends that his fundamental right to be present at trial was violated when the district court held many hearings in his absence.[26] White specifically contends that he was not present at hearings held on April 4, 1990, February 6, 1991, April 16, 1991, and July 2, 1991. White alleges that the "review cannot be done in this case because there is no record of much of what went on." We find no error.

 Article II, section 16, of the Colorado Constitution, and the Due Process Clause, as well as the Sixth Amendment to the United States Constitution, guarantee the right of a criminal defendant to be present at all critical stages of the prosecution. *Larson v. Tansy,* 911 F.2d 392 (10th Cir.1990); *Luu v. People,* 841 P.2d 271 (Colo.1992) (stating that both the Sixth Amendment and the Due Process Clause of the federal Constitution give an accused a right to be present at trial); *People ex rel. Farina v. District Court,* 185 Colo. 118, 121, 522 P.2d 589, 590 (1974) (holding that a defendant has a right to be present at every critical stage in a criminal prosecution under both the United States and Colorado Constitutions). The right to be present is not absolute; thus due process "does not require the defendant's presence when his presence would be useless, or the benefit nebulous." *Larson,* 911 F.2d at 394; *see Luu,* 841 P.2d at 273–75.

 With respect to the hearing held on April 16, 1991, White does not contend that this hearing amounted to a "critical stage" of the proceeding. A review of the transcript of the hearing reveals that: (1) one of White's attorneys sought to file a motion to withdraw as counsel in the event that White would enter a plea of guilty; (2) counsel for White informed the court that Dr. Morall—whom the district court had appointed on February 12, 1991, to conduct an evaluation of White and to submit to the district court a report stating whether White was competent to proceed to a providency hearing—was busy and needed an extension of time to prepare an evaluation; (3) White did not want a continuance and would not enter a plea if a continuance was granted; and (4) counsel for White wanted to wait until Dr. Morall's report was completed; and (5) White wanted to proceed, even though he knew it would be without Dr. Morall's report. The district court stated that one report (by Dr. Sundell) had previously been submitted to the district court finding White to be competent and that White understood that, by proceeding, he would not get the benefit of the second com-

---

26. White specifically contends that
 XIX. The many off-the-record hearings in this case denied Mr. White his rights under the Due Process and Cruel and Unusual Punishment Clauses.

 XX. Mr. White's fundamental rights were violated when the court held many hearings in this case in Mr. White's absence, all without any waiver of Mr. White's right to be present.

petency evaluation. The district ruled that the hearing would proceed as scheduled.

With respect to this hearing, the record does not reveal that the April 16, 1991, hearing was a critical stage of the prosecution, as the only action taken by the district court was to accede to White's request to proceed with a providency hearing with one and not two competency evaluations. Additionally, the benefit of White's presence at this hearing would have been nebulous, as his attorneys adequately informed the court of White's opinion that he did not want the providency hearing continued. We find no deprivation of White's constitutional right to be present on these facts.

■ With respect to any hearings held on April 4, 1990, February 6, 1991, and July 2, 1991, no transcript of hearings held on those dates appears in the record on appeal.

It is the defendant's responsibility to designate the record on appeal, including such parts of the trial proceedings as are necessary for purposes of the appeal.... Any facts not appearing of record cannot be reviewed. The presumption is that material portions omitted from the record would support the judgment.

*People v. Wells,* 776 P.2d 386, 390 (Colo.1989) (citations omitted); *see People v. Velarde,* 200 Colo. 374, 616 P.2d 104 (1980). White does not contend, and we have no means by which to determine, whether hearings held on those dates amount to critical stages of the prosecution. In the absence of a record on appeal, we presume that White's right to be present was not denied. We reject White's contentions.

**X.**

Based on the foregoing, we conclude that the district court's ruling is constitutionally reliable and affirm the sentence of death. This case is remanded to the district court to set a date for the execution of the sentence.

MULLARKEY, J., concurs in part and dissents in part, and KIRSHBAUM, J., joins in the concurrence and dissent.

LOHR, J., dissents.

Justice MULLARKEY concurring in part and dissenting in part:

I agree with the majority that the trial court's use of the "especially heinous, cruel, or depraved" aggravator set forth in section 16–11–103(6)(j), 8A C.R.S. (1986), was improper. Maj. op. at 447–448. This is not a case like *People v. Rodriquez,* 794 P.2d 965 (Colo.1990), *cert. denied,* 498 U.S. 1055, 111 S.Ct. 770, 112 L.Ed.2d 789 (1991) (victim died of multiple stab wounds, among which were shallow cuts indicating she was tortured), or like *People v. Davis,* 794 P.2d 159 (Colo. 1990), *cert. denied,* 498 U.S. 1018, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991) (victim raped, beaten and then shot multiple times in the head and chest), in which the victims' bodies were mutilated and abused during the perpetration of their murders. In such cases, all wounds are properly considered under the "especially heinous, cruel, or depraved" aggravator as indicators of the way in which death was inflicted on the victim.

In the case before us, however, a full day passed between the victim's death by gunshot wound to the head and the mutilation of the body. Moreover, such mutilation occurred not during the murder itself but rather during the defendant's subsequent efforts to dispose of the corpse. I agree with the majority that, under these circumstances, the defendant's mutilation of the victim's corpse does not constitute evidence that the murder was committed "in an especially heinous, cruel, or depraved manner." Therefore, the trial court erred when it found that this statutory aggravator was applicable.

I dissent because I am not certain beyond a reasonable doubt that the trial court would have imposed a sentence of death if it had not considered the "especially heinous, cruel, or depraved" aggravator but rather had relied solely on White's two other convictions for first degree murder under the "prior violent felony" aggravator. § 16–11–103(6)(b), 8A C.R.S. (1986). I would vacate the death sentence and remand the case for resentencing to life imprisonment.

The record clearly shows that the trial court emphasized those facts which it erroneously considered relevant to the "especially heinous, cruel, or depraved" aggravator, such

as the evidence as to corpse mutilation.[1] The prosecution's portion of the sentencing hearing makes up 145 pages of the trial transcript. Proof of the prior violent felony aggravator consumes only two pages of the transcript, consisting of the introduction into evidence of self-authenticating documents under C.R.E. 902 to prove White's previous murder convictions. By contrast, highly prejudicial testimony regarding the dismemberment of the corpse permeated the entire sentencing hearing.

A coroner testified, for example, that severing Vosika's head and hands "would be a slow, tedious process." Police officers also testified that White dismembered the corpse and had sex with someone soon after killing Vosika. Roger Gomez testified at length as to what White told him about the disposal of the corpse. Several recorded interviews were introduced into evidence which delved into the gory details of the post-mortem mutilation.

The transcript of the prosecution's closing argument in the sentencing hearing reflects this same erroneous focus. While only one paragraph deals with the prior violent felony aggravator, the prosecution spends five pages on the "especially heinous, cruel, or depraved" aggravator. As the majority concedes, maj. op. at 448, this testimony should have been disregarded for sentencing purposes. The record leads to the inevitable conclusion, however, that in fact such evidence played an integral part in the trial court's decision to impose the death penalty.

The trial court's death sentencing order is 28 pages in length. Only three of those pages discuss the prior violent felony aggravator. By contrast, discussion of the invalid "especially heinous, cruel, or depraved" aggravator covers eight pages of the same order. The trial court reviewed the defendant's four interviews, as well as a number of

letters White wrote to the district attorney and law enforcement officials, and White's testimony and demeanor. The trial court considered the relationship between the defendant and Vosika ("a friendship founded upon mutual drug use and involvement in drug transactions"—one and one half pages of the order), the manner in which Vosika was killed (a single gunshot to the back of the head, without any physical torture—just under one page), and the disposal of the body (one page). As to the facts of the disposal of the body, the trial court stated:

> After defendant shot and killed Vosika he immediately wrapped the body in a shower curtain and placed it in the trunk of his Mazda automobile. At this time the defendant noticed the next door neighbor driving into her garage, and because White's garage windows were dirty, confused the brake lights with the emergency equipment of a police car. Therefore, he abandoned further efforts to dispose of the body that night. The next day, in the early afternoon, defendant drove his Mazda vehicle to the Rye/Colorado City area to dispose of the body. Defendant's intent was to bury the body, and he therefore brought a shovel. After removing the body from the trunk and while defendant was pulling Vosika's body through a fence he was interrupted by the appearance of a red pickup truck. Although the pickup truck drove away, defendant was convinced he had been discovered. This fear caused him to strike Vosika's corpse in the face with the shovel as retribution for the consequences of the presumed discovery. Defendant then hid the body, returned to Pueblo and purchased a fine tooth saw in order to dismember Vosika's body. He immediately returned to the burial site and severed Vosika's head and hands and buried the torso separate from the hands and head, which were buried together in a

1. In *Davis* and *Rodriguez,* the "especially heinous, cruel, or depraved" aggravator was not properly narrowed when the jury was instructed. One factor which we noted as supporting our decision to uphold the death verdict was that the use of the improper aggravator did not permit the jury in either case to consider any improper evidence. All of the evidence admitted in the *Davis* and *Rodriguez* penalty phases related to

another valid aggravator. *Davis,* 794 P.2d at 180 n. 14; *Rodriguez,* 794 P.2d at 983. Here, however, the trial court considered a great deal of extremely prejudicial evidence at the sentencing hearing about how White treated Vosika's corpse, even though such information is entirely irrelevant to the only aggravator applicable in this case.

trash bag. Defendant washed the saw in nearby water and abandoned it, as well as the shovel, in the area and returned to Pueblo disposing of all incriminating evidence in various trash bins around the city. Subsequently, he moved from the Bonnymede address.

In light of the above, I cannot agree with the majority that the trial court would have imposed the death penalty absent its erroneous consideration of highly prejudicial evidence. The record fails to support the majority's view that the error committed in this case was harmless beyond a reasonable doubt. *See Clemons v. Mississippi,* 494 U.S. 738, 753–54, 110 S.Ct. 1441, 1451, 108 L.Ed.2d 725 (1990) ("Under these circumstances [that is, where one of the two aggravators found by the jury was held to be invalid], it would require a detailed explanation based on the record for us possibly to agree that the error in giving the invalid 'especially heinous' instruction was harmless.").

Furthermore, in performing the third step of the sentencing analysis, the trial court stated:

The Court has considered not only the mitigating factors listed above but all mitigation of record and has weighed these factors against only the proven statutory aggravating factors and no others.

The Court, having considered the matter as required by law, is convinced beyond a reasonable doubt that all mitigating factors of record do not, beyond a reasonable doubt, outweigh proven statutory aggravating factors.

Such purported "weighing" gives this court no basis upon which to determine what weight the trial court afforded each aggravator, or the combined weight of the mitigating evidence found, or that, if the trial court had not considered the invalid aggravator, it nonetheless would have imposed a death sentence. Although the weighing mandated by statute is not a mechanical process, but rather "a profoundly moral evaluation of the defendant's character and crime," *People v. Tenneson,* 788 P.2d 786, 791 (Colo.1990) (quoting *Satterwhite v. Texas,* 486 U.S. 249, 261, 108 S.Ct. 1792, 1800, 100 L.Ed.2d 284

(1988) (Marshall, J., concurring in part and concurring in the judgment)), it is important to note that the trial court had only two aggravators which it placed on the scales against the thirteen mitigators that it found. The assessment changes completely when one of those aggravators is removed. *See Stringer v. Black,* —— U.S. ——, ——, 112 S.Ct. 1130, 1137, 117 L.Ed.2d 367 (1992) ("[W]hen the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale."). The record is simply devoid of any indication that the trial court would have reached the same conclusion had it correctly weighed the single applicable aggravator against the extensive list of mitigators.

In reaching a different conclusion, the majority commits the same mistake for which it rebukes the trial court, that is, it relies almost exclusively upon the facts underlying the invalid "especially heinous, cruel, or depraved" aggravator. The voluminous testimony regarding that aggravator seems to have inspired a degree of morbid fascination in the events following the murder of Vosika. Even the majority cannot resist the temptation to dwell on such highly prejudicial facts. For example, the majority sets forth in detail the post-mortem abuse and grisly mutilation of Paul Vosika's body. Maj. op. at 427–430 (statement of the facts) & 449–450 (sentencing analysis). Such information is simply irrelevant, however, to a determination as to the prior violent felony aggravator. *See Clemons v. Mississippi,* 494 U.S. at 753, 110 S.Ct. at 1450 (finding the Mississippi Supreme Court's decision to uphold the death penalty "very difficult to accept" in light of its repeated emphasis upon and analysis of the invalid "especially heinous" aggravator in its death sentence order).

The majority compounds this error by considering the facts underlying the murders of Victor Woods and Raymond Garcia. Maj. op. at 427, 432–433, 449–450. Unlike the trial court, which considered certain facts concerning White's prior convictions for the limited purpose of determining whether they

involved crimes of violence,[2] the majority erroneously emphasizes other highly prejudicial testimony, such as White's alleged lack of remorse in killing Garcia or his "toying with [Woods] for half an hour" prior to stabbing him. *Id.* Any evidence other than the fact that one crime was committed with a knife and the other with a gun was correctly disregarded by the trial court, and incorrectly considered by the majority, because such information was irrelevant to determining whether White had been previously convicted of a class 1 or 2 felony involving violence. § 16–11–309(2)(a)(I).

The majority also fails to give appropriate consideration to the mitigating factors found by the trial court. Despite the fact that the invalidation of an aggravating factor necessarily renders any evidence of mitigation "weightier" or more substantial, the majority simply ignores several important mitigating factors. For example, the majority does not discuss the fact that, while in prison serving two life sentences for other crimes, White voluntarily brought this crime to the authorities' attention and confessed. As the majority correctly notes, the Vosika murder investigation was inactive when White confessed his involvement. Maj. op. at 428. Vosika's body had been found and identified in May 1988, but no charges had been filed as of late November 1989 when White first approached the correctional officer. Apparently White was not a suspect, nor was there any physical evidence specifically connecting White to the Vosika homicide, and without his confession, White would not have been prosecuted for this crime. Until White came forward, the prosecution had nothing more than another unsolved crime on its hands.

The majority's failure to address this mitigator, much less to give this mitigator its due weight, converts the death penalty weighing process into a meaningless exercise. By its failure to acknowledge White's essential role in developing the prosecution's case, the majority provides a powerful disincentive to every individual who is considering whether to confess and cooperate with the police. When the General Assembly included "cooperation with law enforcement officers or agencies" among the statutory mitigators, it clearly intended to encourage and reward voluntary efforts to come forward with information regarding criminal conduct that may have been committed by a defendant. § 16–11–103(5)(h), 8A C.R.S. (1986). The majority opinion undermines this policy by providing no analysis of the relevance of White's confession to its decision as to whether the trial court would have imposed the death penalty if it had only considered the one valid aggravator.

Finally, although the majority grudgingly mentions that White claimed to seek the death penalty as a means of escaping brutal prison conditions, *id.* at 450, it fails to discuss the factual support for such a claim. That is, in addition to several inmates testifying to having seen White being severely beaten by prison guards, White appeared for a trial court proceeding in the present case so severely injured that the trial court ordered emergency medical treatment for him.[3] By abstracting this mitigator from its factual underpinnings, the majority minimizes its significance and avoids dealing with what may have been White's greatest incentive to exaggerate the lurid details of Vosika's murder.

In conclusion, I believe that the prosecution failed to carry its burden of showing that the trial court's consideration of the invalid aggravator constituted harmless error beyond a reasonable doubt. To the contrary, the record indicates that the testimony surrounding the "especially heinous, cruel, or depraved" aggravator was essential to the trial court's determination to impose the death sentence. Accordingly, I would vacate

---

**2.** Although two police officers, Kenneth Fiorillo of the Colorado Springs Police Department, and Daniel Snell of the City of Pueblo Police Department, testified as to the details of the murders of Victor Lee Woods and Raymond Garcia, respectively, the trial court stated in its death penalty order that "references to underlying circumstances of defendant's prior first-degree murder convictions and other convictions ... have been disregarded and not considered for any purpose."

**3.** White was incarcerated continuously both before and during the pendency of this case.

the sentence of death and remand the case for resentencing to life imprisonment.

KIRSHBAUM, J., joins in this concurrence and dissent.

Justice LOHR dissenting:

The majority concedes that the district court considered legally impermissible evidence and therefore erred in finding that one of the two aggravating factors it relied upon in arriving at a sentence of death—that the defendant committed the crime in an especially heinous, cruel, or depraved manner— had been established. Nevertheless, the majority concludes that the error was harmless because the court would have sentenced the defendant to death even in the absence of that aggravating factor. I disagree, first because I do not believe harmless error analysis is permissible under the Colorado statutes in resolving the death penalty issue in this case, and second because even if harmless error analysis were permissible, the record falls far short of demonstrating beyond a reasonable doubt that the district court would have sentenced the defendant to death in the absence of that aggravating factor. The record also reflects other errors, detailed in the course of this dissent, that reinforce the conclusion that the death sentence does not satisfy the high standard of reliability necessary to the constitutional sufficiency of such a sentence. I therefore respectfully dissent.

I

The Colorado death penalty statute, § 16–11–103, 8A C.R.S. (1986 & 1987 Supp.),[1] establishes a four-step process for deliberation by a district court when it determines whether a defendant who has pleaded guilty to a class 1 felony should be sentenced to life imprisonment or to death.[2] First, the court

must find whether the prosecution has proved the existence of at least one statutory aggravating factor beyond a reasonable doubt. § 16–11–103(2)(a)(I), (3), (6); *People v. Tenneson*, 788 P.2d 786, 791 (Colo.1990). Second, if the court finds that at least one statutory aggravating factor exists, then the court must consider whether any mitigating factors exist. § 16–11–103(2)(a)(II), (3), (5). Third, the court must determine whether the prosecution has convinced it beyond a reasonable doubt that mitigating factors do not outweigh the statutory aggravating factor or factors previously found to exist. *Tenneson*, 788 P.2d at 795. Fourth, if the court finds beyond a reasonable doubt that mitigating factors do not outweigh the proven statutory aggravating factors, then the court must decide whether the prosecution has convinced it beyond a reasonable doubt that the defendant should be sentenced to death. *Id.* at 796.

II

At step one in its process of deliberation, the district court found that the prosecution had established beyond a reasonable doubt the existence of two statutory aggravating factors. First, it found that the prosecution had established beyond a reasonable doubt that White "was previously convicted in this state of a class 1 ... felony involving violence as specified in section 16–11–309." § 16–11–103(6)(b). The court based this finding on certified state documents indicating that White had previously been convicted twice in Colorado of first-degree murder. Second, it found beyond a reasonable doubt that White killed in a pitiless and conscienceless manner that was unnecessarily torturous to his victim, Paul Vosika, and that therefore the prosecutor had established beyond a reasonable doubt that White "committed the offense in an especially heinous, cruel, or depraved

---

1. Because the victim, Paul Vosika, was murdered sometime between August of 1987 and March of 1988, the applicable death penalty statute for this case is § 16–11–103 as amended by an Act approved April 30, 1987, ch. 120, sec. 1, 1987 Colo.Sess.Laws 625. This 1987 Act amended § 16–11–103 by inserting into § 16–11–103(6)(g) the words "or attempted to commit." The application or interpretation of § 16–11–103(6)(g) is not an issue in this case, and thus for all prac-

tical purposes the applicable death penalty statute in this case is § 16–11–103, 8A C.R.S. (1986).

2. When a defendant's guilt is found by a jury, the trial jury, and not the court, determines the appropriate sentence during the penalty phase of the trial by following the same four-step process. *See* § 16–11–103(1)(a).

manner." § 16–11–103(6)(j) (hereinafter "the especially heinous killing aggravator").[3] The court based this finding on detailed findings that it made concerning events that led to the crime, the manner of killing, and the manner of disposal of the body.

At step two in its process of deliberation, the district court found numerous mitigating factors. *See* maj. op. at 437. Among others, these factors include that White's capacity to appreciate the wrongfulness of his conduct was significantly impaired, that White was a cocaine and alcohol addict at the time of the crime, that White believed that the killing was morally justified, that White twice stated that he feels bad about the killing, that White is compassionate concerning the living conditions imposed upon the mentally ill and other disadvantaged inmates in prison, that White does not want to die, that White has reestablished ties with the Christian church, and that White has a good relationship with his parents. *See* § 16–11–103(5)(b), (i), (j), (*l*).

The district court stated in its sentencing order that at step three its task was to determine whether it was "convinced beyond a reasonable doubt that ... sufficient mitigating factors do not outweigh proven statutory aggravating factors." The court then concluded that it was "convinced beyond a reasonable doubt that all mitigating factors of record do not, beyond a reasonable doubt, outweigh proven statutory aggravating factors."

At step four, after acknowledging certain salient mitigating factors, the district court concluded:

> The intensity of defendant's violence has resulted in two prior first-degree murder convictions for the murder of two persons. In the present case, defendant's violence was inflicted in a pitiless and torturous manner upon a helpless friend. The Court

concludes beyond a reasonable doubt that the sentence of death is appropriate. Accordingly, the sentence of death shall be and the same is hereby imposed.

## III

The majority holds that at step one the district court considered impermissible evidence of post-death abuse of the victim's body and therefore erred in finding that the prosecution established beyond a reasonable doubt the existence of the especially heinous killing aggravator. Maj. op. at 448. I agree with this holding. However, following *People v. Davis,* 794 P.2d 159, 177–79 (Colo.1990), the majority explains that the federal constitution does not necessarily require the reversal of a death sentence if a state appellate court finds that the sentencing body considered impermissible evidence in the course of concluding that the prosecution established the existence of a statutory aggravating factor. Maj. op. at 448; *Davis,* 794 P.2d at 177. Instead, under *Davis,* an appellate court has three other alternatives. *Davis,* 794 P.2d at 179. First, it may reweigh the aggravators and mitigators and determine whether a sentence of death is appropriate. Second, it may apply a form of harmless error analysis in which the issue is whether the sentencing body would have imposed the death sentence even if the sentencing body had not considered the invalid aggravator. Third, if the sentencing body labored under an unconstitutionally broad interpretation of an aggravator, then the appellate court may apply a second form of harmless error analysis in which the issue is whether beyond a reasonable doubt the sentencing body would have imposed the death sentence if it had deliberated under a constitutionally permissible interpretation of the aggravator. *Id.*

---

**3.** In *People v. Davis,* 794 P.2d 159 (Colo.1990), we held that the language in § 16–11–103(6)(j) that an aggravator exists if the offense was committed in "an especially heinous, cruel, or depraved manner," is unconstitutionally vague, but that if this language is more narrowly interpreted to mean that the offense was committed in a "'conscienceless or pitiless' manner which was 'unnecessarily torturous to the victim,'" then

this language expresses a constitutionally permissible aggravator. *Davis,* 794 P.2d at 176–77. It is in light of *Davis* that the district court considered whether the murder was committed in a conscienceless or pitiless and unnecessarily torturous manner when it decided that the prosecution had established the existence of the especially heinous killing aggravator.

The majority relies on the second of these three alternatives, finding beyond a reasonable doubt that the district court would have imposed the death sentence even if it had not considered the especially heinous killing aggravator. Maj. op. at 452. I disagree with the majority's resolution of this issue because, unlike the federal constitution, Colorado statutes do not permit this form of harmless error analysis in death penalty cases. *See infra* part IV A. More important, perhaps, is that even if harmless error analysis were permissible, the record falls far short of demonstrating beyond a reasonable doubt that the district court would have sentenced the defendant to death in the absence of considering the especially heinous killing aggravator. *See infra* part IV B. Nor does the record demonstrate that the district court would have found the existence of the especially heinous killing aggravator, and imposed the death sentence, if it had not considered evidence of post-death abuse of the body, or if it had not improperly excluded evidence offered by the defendant to disprove the existence of the especially heinous killing aggravator. *See infra* part IV C.

## IV

### A

In noncapital cases, sentencing is the province of the trial court, not of an appellate tribunal. *People v. Fuller*, 791 P.2d 702, 708 (Colo.1990). The premise for this assignment of function is that "the trial court is a better arbiter of the facts than the appellate court because of its greater familiarity with the defendant and the facts of the case." *People v. Watkins*, 684 P.2d 234, 239 (Colo. 1984); *cf. United States v. Cruz*, 581 F.2d 535, 541 (5th Cir.1978) ("The trial judge has observed the appearance and demeanor of the witnesses and heard their voices; he has breathed in the atmosphere of the courtroom and observed the multitudinous details that do not appear on the record. We see but the insentient notations on a typed manuscript.") (overruled on an unrelated ground by *United States v. Causey*, 834 F.2d 1179, 1184 (5th

Cir.1987) (en banc)).[4] Nevertheless, even in a noncapital case, an appellate court must vacate a sentence if it is not within the range required by law or if it was based on inappropriate considerations. *See Fuller*, 791 P.2d at 708. In capital cases sentencing is also the province of the judge or jury, each of which has observed the presentation of the evidence and therefore is better able than an appellate court to determine the facts relevant to sentencing. § 16–11–103(1)(a). In addition, it seems all the more appropriate in a capital case that an appellate court recognize that the images it forms of a defendant and witnesses are the same types of images that are formed when reading a novel or a play and that such images are untrustworthy substitutes for direct perceptions regardless of the power of the appellate court's imagination or the depth of its moral conviction. *Cf. Goldberg v. Kelly*, 397 U.S. 254, 264, 269, 90 S.Ct. 1011, 1018, 1021, 25 L.Ed.2d 287 (1970) (a preliminary fact finding hearing based solely on written submissions is insufficient for procedural due process when an incorrect result might deprive an eligible welfare recipient of "the very means by which to live" while he awaits a full evidentiary hearing). Similarly, a district court's written findings can but imperfectly impart the difficult thought processes that have caused the judge to make the statutorily required determinations in a capital sentencing proceeding. *Cf. Davis*, 794 P.2d at 231 (Kirshbaum, J., dissenting) (finding untenable the view that this court can accurately psychoanalyze the state of mind of the sentencing body). Capital sentencing is therefore uniquely the province of the trier of fact, who is required in Colorado by statute to weigh in the balance the character of the defendant and to make the difficult moral judgment of whether a death sentence is warranted. § 16–11–103(2), (3), 8A C.R.S. (1986). Perhaps for these reasons, Colorado's death penalty statute, § 16–11–103, 8A C.R.S. (1986), in my opinion, does not contemplate this court weighing "redefined aggravating factors and mitigating factors for the first time on appeal." *People v.*

---

4. Appellate courts in Colorado do not have the authority to engage in fact finding. *E.g., People in re D.G.P.*, 194 Colo. 238, 242, 570 P.2d 1293,

1295 (1977); *Godfrey v. People*, 168 Colo. 299, 301, 451 P.2d 291, 292 (1969).

*Rodriguez,* 794 P.2d 965, 1000 (Colo.1990) (Lohr, J., dissenting); *see id.* at 1005 (Kirshbaum, J., dissenting) ("any appellate reweighing of evidence is beyond the appellate authority of this court, especially in capital cases, where the General Assembly has carefully allocated to the factfinder the sole authority to impose a sentence of death"). Nor does section 16–11–103 authorize this court to speculate about what the sentencing body would have decided if the form of its deliberation had not been contrary to the law. *Cf.* Charles Alan Wright, *The Doubtful Omniscience of Appellate Courts,* 41 Minn.L.Rev. 751, 751 (1957) (admonishing appellate courts for attempting to obtain "complete control of litigation" by "the transmutation of specific circumstances into questions of law"). In short, Colorado statutes and sound judicial policy do not permit the kind of appellate reweighing of mitigating and aggravating factors that is essential to the harmless error analysis relied upon by the majority. *Rodriguez,* 794 P.2d at 1000 (Lohr, J., dissenting); *Davis,* 794 P.2d at 225 (Lohr, J., dissenting); *id.* at 230–31 (Kirshbaum, J., dissenting).

### B

Even if harmless error analysis were permissible, consideration of the district court's reasoning at steps three and four leads me to the conclusion that the death sentence cannot stand in this case. First, the district court's account of its reasoning at step three consists entirely of the following:

> The Court has considered not only the mitigating factors listed above but all mitigation of record and has weighed these factors against only the proven statutory aggravating factors [i.e., the especially heinous killing aggravator and the fact that White was twice previously convicted in Colorado of class 1 felonies involving violence] and no others.

> The Court, having considered the matter as required by law, is convinced beyond a reasonable doubt that all mitigating factors of record do not, beyond a reasonable

doubt, outweigh proven statutory aggravating factors.

The district court provides no account of how it weighed the two aggravating factors against the mitigating factors that it found, nor in particular does it suggest that either aggravating factor is by itself sufficient to outweigh all of the mitigating factors. The only thing that I can conclude from this beyond a reasonable doubt is that there is no principled way to determine what the district court would have done at step three if it had not weighed the especially heinous killing aggravator. *Cf. Davis,* 794 P.2d at 222 (Quinn, C.J., dissenting) (a conclusion about what the sentencing body would have done if it had considered an aggravating factor differently is nothing but a guess); *Tenneson,* 788 P.2d at 791–92 (there is a special need for reliability and certainty in capital sentencing decisions because the death penalty is uniquely severe and final).

Second, speculation in fact about what the district court would have done at step three is made more difficult because the court appeared twice to confuse, or at least to treat carelessly, the legal standard to be applied at step three when weighing mitigating and aggravating factors. *See* maj. op. at 437–442 (finding it necessary to *presume* that the district court applied the correct legal standard). That is, in its written sentencing order and in its oral summary thereof, the court summarized its conclusion at step three by characterizing the issue as whether, beyond a reasonable doubt, the mitigating factors outweighed the aggravating factors, instead of whether, beyond a reasonable doubt, the mitigating factors did not outweigh the aggravating factors.[5] Although subtle in terms of language, the difference between these formulations is conceptually important because under the proper standard if there is reasonable doubt about whether the mitigating factors outweigh the aggravating factors, then the court must impose life imprisonment, whereas under the improper standard,

---

5. As previously indicated, the court wrote: "The Court, having considered the matter as required by law, is convinced beyond a reasonable doubt that all mitigating factors of record do not, beyond a reasonable doubt, outweigh proven statu-

tory aggravating factors." From the bench, the court explained: "I'm convinced beyond a reasonable doubt that all mitigating factors of record do not beyond a reasonable doubt outweigh proven aggravating factors."

if there is reasonable doubt about whether the mitigating factors outweigh the aggravating factors, then the court may still impose the death sentence.

My doubts multiply when I consider step four of the process. After referring to some of the mitigating factors, the district court summarized its conclusion at step four as follows:

> The intensity of defendant's violence has resulted in two prior first-degree murder convictions for the murder of two persons. In the present case, defendant's violence was inflicted in a pitiless and torturous manner upon a helpless friend. The Court concludes beyond a reasonable doubt that the sentence of death is appropriate.

According to the district court, there are thus two factors from which it concluded at step four that the death sentence is appropriate, specifically, that White killed his friend in a pitiless and torturous, i.e., especially heinous, cruel, or depraved, manner and that White was previously convicted twice of first-degree murder. The district court does not attempt to explain the relative weight of these two factors, and in the absence of any explanation the court's language suggests to me as much as it does anything else that the court thought that they were roughly of equal importance. Based on this review of step four alone, I am unable to say with the majority that beyond a reasonable doubt the district court would have imposed the death sentence absent consideration of the especially heinous killing aggravator. When I reflect

on this conclusion together with those additional uncertainties that I previously identified as pertaining to step three of the process, see supra pp. 466–467, this is especially true.[6]

## C

The majority relies upon the second of the three alternative forms of appellate review described in Davis, 794 P.2d at 179. See supra p. 464. Another approach that suggests itself would be to rely on the third of these three alternatives, and accordingly to ask whether the district court would have found at step one the existence of the especially heinous killing aggravator, and that the death sentence was appropriate at steps three and four, if it had not considered as relevant the post-death abuse of the body. Before addressing this alternative approach, I reiterate my view that Colorado statutes do not permit any of the three forms of appellate review described in Davis, 794 P.2d at 179. See supra part IV A. Even if such review were permissible, however, not only is it unclear from the record whether the district court would have found the existence of the especially heinous killing aggravator if it had not relied at step one on evidence of post-death abuse of the body, but the district court erred as a matter of constitutional law by excluding evidence offered by the defendant to disprove the existence of that aggravator. The effect that this exclusion of evidence had upon the district court's reasoning

---

6. In an address delivered at the University of Chicago Law School on October 3, 1961, then Associate Justice Roger J. Traynor of the California Supreme Court described generally the difficulty in determining harmless error:

> It is more difficult by far to determine whether error is prejudicial than to determine whether evidence is substantial. Once in a while there are fortunately signs to go by. Thus comments or written opinions by a trial judge may reveal the influence of error upon him. Likewise, grossly excessive or inadequate damages may suggest the influence of error upon a jury; conversely, a jury's answer to a special interrogatory may reveal that an error was harmless.
>
> For the most part, however, even with the whole record at hand, an appellate judge has no record of whatever influence error may have exercised on the mental processes of the

trier of fact, and he cannot pry open a mind, let alone visualize its past operations. He has nevertheless a responsibility to bring intuition and reasoning to bear on the elusive problem of influence. Were he to shirk doing so, simply affirming any result that he can approve as a reasonable one, he would in effect constitute himself the trier of fact and irrationally attribute to the legitimate trier of fact his own freedom from the influence of the now known error. In thus making his own trial run of the record, instead of undertaking the complex evaluation of what influence error wielded in the original trial run, he might discount error automatically as harmless that on searching reflection he would have adjudged prejudicial.
Roger J. Traynor, La Rude Vita, La Dolce Giustizia; or Hard Cases Can Make Good Law, 29 U.Chi.L.Rev. 223, 227–28 (1962) (footnote omitted).

is uncertain not only at step one, but at steps three and four as well.

The court summarized its conclusion at step one as follows:

> Defendant, subsequent to this murder, demonstrated a complete indifference to the humaneness and to the sanctity of life of his former friend by brutally striking, in a rage, the face of Paul Vosika's corpse. The method used to kill Paul Vosika, *along with the acts of striking and then dismembering the body,* reflect beyond a reasonable doubt conscientiousless [sic] and pitilessness that can only be explained beyond a reasonable doubt by White's satisfaction in the act of killing in a manner "unnecessarily torturous" to Vosika.

(Emphasis added.) It is therefore doubtful whether the court would have found the especially heinous killing aggravator to have been established had it not considered the post-death abuse of the body. Furthermore, the post-death abuse of the body was well established at the sentencing hearing on the basis of physical evidence, whereas evidence in the record of the specific manner that Vosika was killed consists entirely of White's contradictory statements,[7] and it appeared that White had a motive to exaggerate the cruelty of his killing.[8] It is thus not unreasonable to believe that the physical evidence of the post-death abuse of the body was an essential part of the basis for the district court's findings at step one. *Cf.* the dissenting opinion of Justice Mullarkey at 459–461,

7. Shortly after the victim's body was discovered and identified, White stated that a person named Bill Young was implicated in the killing. Approximately eighteen months later, White told a correctional officer named Frank Perko that White alone was responsible for the killing and that the killing took place in Cheyenne, Wyoming. A month later White told Roger Gomez of the Pueblo County Sheriff's Department a similar story. A month later White told Richard Avery, who was then an undersheriff investigating the case, that White and Bill Young committed the murder in the garage of White's apartment at 119 Bonnymede in Pueblo. A month later White told Tony Spinuzzi of the Pueblo County Sheriff's Department that White alone committed the murder in White's garage at 119 Bonnymede. Thereafter, White wrote to the district attorney and told him that the murder really took place behind White's girlfriend's house. At the sentencing hearing, White intimated that the killing took place in Wyoming.

Richard Avery testified at the sentencing hearing that he knew of no physical evidence that connected White to the murder. Roger Gomez was asked directly at the sentencing hearing if he had a clear picture of how or where Paul Vosika died, and he answered "I believe Mr. White, the many times I've spoken to him, that he in fact did kill Paul Vosika. Where he did or where he didn't ... I can't indicate one way or the other on that."

It is also somewhat puzzling that although the district court singled out as "very credible" White's interview with Spinuzzi in which White says he killed Vosika in the garage of White's apartment at 119 Bonnymede in Pueblo, when the court concluded in its written order that the existence of the especially heinous killing aggravator had been established, the only quotation from White included as support for that conclusion was White's statement to Gomez that White took satisfaction in taunting Vosika before White shot Vosika near a trucking company in Chey-

enne, Wyoming. Furthermore, during the Spinuzzi interview, Spinuzzi told White: "You are the most manipulating person I ever met in my life.... You tell so many lies you don't know when the truth is coming out," and "on a zero to ten scale" of credibility "[your credibility is] minus forty."

8. During his interview with Avery, White said that he had lied to Gomez in part because "I want to stick with the death penalty. I wanted [to] make it look like I didn't have no consci[ence], you know." Approximately one month later White told Spinuzzi that White wanted to go to death row because "I can't live a [C]hristian life being anywhere else. Death row, you[']r[e] alone you can stay upon there and get your mind right, piece [sic] of mind. In here no matter where you[']r[e] at in the hole, you have to go to war with people." Then, in letter to his parents, White wrote:

> You probably heard that they were going for the death penalty. I think that[']s good. Not dying, but if the only way to expose the corruption here is to take that route then it is worth it.... When I confessed I had two motives. One was to get somewhere to do my time without having to kill or be killed and I could have some incentive. If I couldn't have that I wanted to make sure I got the death penalty because I know that[']s the only possible way to get the truth out. You know some of the things that go on here I can prove how outrage[ou]s it is. I'm not crying about being in prison. I deserve to be here and I can handle it better than most but·I can't handle the corruption and felonies I see committed against myself and other inmates
> .... I also wrote some mock confessions to make it sound like I was very unsensitive [sic] so that if they went for the death penalty I would get it.

further detailing the district court's emphasis of this evidence in arriving at the sentence of death.

Also of importance, the district court improperly excluded evidence that, based on the offer of proof made by defense counsel, cast doubt on the specific version of the killing accepted by the court as reliable beyond a reasonable doubt. That is, the trial court found beyond a reasonable doubt that White murdered Paul Vosika in the garage of White's apartment at 119 Bonnymede in Pueblo and that "the best estimate as to the date of Paul Vosika's murder [was] August 17, 1987." Defense counsel sought at the sentencing hearing to present testimony from, among others, three persons named Jim Crane, Mike Steele, and Francis Steele. Defense counsel stated in his offer of proof that Jim Crane, who was White's landlord at 119 Bonnymede, would testify that White moved out of 119 Bonnymede in early October of 1987; defense counsel also stated that Mike and Francis Steele would testify that White and Paul Vosika came to their house in Rye, Colorado, in late October or early November of 1987. This testimony was offered to show that Vosika was not killed before late October and that because Vosika was seen alive after White moved out of 119 Bonnymede, White's confession to Spinuzzi, see supra note 7, of the manner in which White killed Vosika in his garage at 119 Bonnymede was not credible. The court excluded testimony from these witnesses on the ground that their testimony was relevant only to the issue of guilt and not to the issue of sentencing and that the issue of guilt had already been decided at the providency hearing.

The federal constitution requires that capital sentencing statutes permit the sentencing body to consider any relevant mitigating evi-

dence regarding the circumstances of the offense. Boyde v. California, 494 U.S. 370, 377–78, 110 S.Ct. 1190, 1196–97, 108 L.Ed.2d 316 (1990); Penry v. Lynaugh, 492 U.S. 302, 315–19, 109 S.Ct. 2934, 2944–47, 106 L.Ed.2d 256 (1989). In addition, section 16–11–103(1)(b), 8A C.R.S. (1986), provides:

> All admissible evidence presented by ... the defendant that the court deems relevant to the nature of the crime, ... including any evidence presented in the guilt phase of the trial, and *any matters relating to any of the aggravating or mitigating factors* ... may be presented.

*Id.* (emphasis added).

Evidence of the circumstances surrounding the death of Paul Vosika relates directly to the existence of the especially heinous killing aggravator. Based upon the offer of proof made by defense counsel, the excluded testimony would have cast doubt on the credibility of the version of the murder found by the district court to be "very credible," and upon which the court relied when it made specific findings concerning the manner in which Paul Vosika was killed. The court therefore misconceived the relevance of the proffered testimony as relating only to the issue of guilt and not also to a central issue at step one in its sentencing deliberations, specifically, whether the prosecution proved beyond a reasonable doubt that White murdered Vosika in a conscienceless or pitiless manner that was unnecessarily torturous to Paul Vosika. Unlike the majority, see maj. op. at 455, I would therefore hold that the district court erred under both the state and federal constitutions, as well as section 16–11–103(1)(b), 8A C.R.S. (1986), when it excluded evidence relevant to disproving the existence of a statutory aggravating factor.[9]

9. *Boyde,* 494 U.S. at 381–82, 110 S.Ct. at 1198–99, and *Penry,* 492 U.S. at 315–19, 109 S.Ct. at 2944–47, discuss evidence of mitigating circumstances. The evidence at issue here relates to the existence of a statutory aggravating factor. Nevertheless, it is clear that evidence that casts doubt upon the existence of a statutory aggravating factor at step one of the Colorado process is one form of mitigating evidence, and its exclusion is therefore prohibited by the federal constitution just as though it were evidence tending to establish an independent mitigating factor at step two. In addition, the state constitution is no less protective of the rights of criminal defendants in capital cases than is the federal constitution. *E.g., Tenneson,* 788 P.2d at 799 ("Both the United States and Colorado constitutions require that a defendant be permitted to submit evidence regarding any aspect of the defendant's character and any circumstances of the offense as a basis for mitigation.")

In short, based upon the district court's summary of its reasoning at step one of the deliberative process, and the lack of relevant physical evidence, it is doubtful whether the court would have found the especially heinous killing aggravator had been established if it had not considered the post-death abuse of the body. Moreover, the court unconstitutionally excluded evidence casting doubt upon the existence of that aggravator. Finally, had the scope of that aggravator been narrowed by elimination of consideration of the post-death abuse of the body, the effect this would have had upon the district court's weighing of aggravators and mitigators at step three and its ultimate determination of the appropriateness of the death penalty at step four is purely conjectural. As a result, I cannot say beyond a reasonable doubt that the district court would have found the existence of the especially heinous killing aggravator, and imposed the death sentence, if it had not relied upon evidence of the post-death abuse of the body, or if it had not improperly excluded relevant evidence.

V

Section 16–11–103(8)(b), 8A C.R.S. (1986), provides:

> If any death sentence is imposed upon a defendant pursuant to the provisions of this section and the imposition of such death sentence upon such defendant is held invalid or unconstitutional, said defendant shall be returned to the trial court and shall then be sentenced to life imprisonment.

The district court erred under the state and federal constitutions, as well as section 16–11–103(1)(b), 8A C.R.S. (1986), when it excluded relevant evidence, and it erred under section 16–11–103(6), 8A C.R.S. (1986 & 1987 Supp.), when it considered post-death abuse of the body as a ground for finding the existence of the especially heinous killing aggravator. Colorado's death penalty statutes do not permit us to consider whether these errors were harmless, and even if they did, I am not convinced beyond a reasonable doubt that the district court would have imposed the death sentence if it had not committed these errors. I would therefore reverse the judgment of the district court and order that the case be remanded to that court with directions that the defendant be sentenced to life imprisonment.